UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 19-3756 JJO

UNITED STATES OF AMERICA

v.

ADRIAN CAMBARA ORTIZ,

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____
WALTER M. NORKIN
ASSISTANT UNITED STATES ATTORNEY
ID no. A5502189
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9406
walter.norkin@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>ADRIAN CAMBARA ORTIZ<br><br>_Defendant(s)_ | )<br>)<br>) Case No. 19-3756 JJO<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __1/2013-5/2019__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sectiona 1956(h), 1956(a)(1)(A) and 1956(a)(1)(B)(i) | Conspiracy to Committ Money Laundering |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Complainant's signature_

Janelle Rudie, Special Agent, FDA
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __10/30/2019__

_Judge's signature_

City and state: __Miami, Florida__      John J. O'Sullivan, U.S. Magistrate Judge
_Printed name and title_

19-3756 JJO

# AFFIDAVIT

I, JANELLE RUDIE, Special Agent with the United States Food and Drug Administration (FDA), Office of Criminal Investigations (OCI), having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1. I submit this application in furtherance of an investigation worked by FDA with the Federal Bureau of Investigation (FBI) and U.S. Marshal Service (USMS).

2. As a Special Agent (SA) with FDA/OCI, I perform the duties provided by law and regulation, and I am empowered to conduct investigations of offenses against the United States.

3. I am currently assigned to the Miami Field Office. I have been employed with FDA since November of 2016. From 2017 to 2018, I was assigned to the FDA Field Office in San Juan, Puerto Rico, and transferred to the Miami Field Office in 2018. I was also a SA with the Department of State, Diplomatic Security from 2009 through 2016. I possess a Bachelor of Arts from the University of Minnesota and a master's degree from Hamline University. I am also a graduate of the Federal Law Enforcement Training Center and the United States, Department of State, Diplomatic Security Basic Special Agent Training Course and the FDA Special Agent Training Program. In my current position with FDA/OCI, I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act, Title 21, United States Code, Sections 301-399f (the "FDCA"), as well as related Title 18 offenses, such as money laundering violations enumerated in Section 1956.

4. This affidavit is made in support of a criminal complaint charging Adrian CAMBARA ORTIZ (hereinafter "CAMBARA") with conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h), 1956(a)(1)(A) and 1956(a)(1)(B)(i).

1

5. Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the affidavit each and every fact known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

6. The statements contained in this affidavit are based on my investigation, information provided by others, and on my experience and training as a federal agent and that of other agents participating in the investigation, including agents of the FBI and USMS.

## PROBABLE CAUSE

### I. The Investigation of a Prescription Drug Diversion Scheme and Related Violations

7. For several years now, I and other law enforcement partners have been conducting an investigation into a prescription diversion and money laundering scheme. This investigation has uncovered a conspiracy by a criminal organization that purchases and distributes millions of dollars in diverted pharmaceuticals (prescription drugs illegally trafficked in a secondary/underground market). The diverted pharmaceuticals are not controlled substances, but rather high priced medical drugs used to treat such conditions as mental illness, human immunodeficiency ("HIV"), and asthma. They are branded drugs (produced by the original pharmaceutical developers) as opposed to lower-priced generic drugs, but are acquired unlawfully -- through fraud, pharmacy burglaries, and cargo thefts -- at a fraction of the cost by purchasers who re-sell them to unwitting pharmacies and thus introduce them back into the legitimate marketplace.[1]

8. Because the pharmaceutical distribution system is regulated, to get diverted drugs back into the market, the diverters must, among other things, establish seemingly legitimate

---

[1] Evidence gathered to date shows that the drugs often are not properly handled and stored; many are beyond their shelf lives and expiration dates. As such, they pose a hazard to the health of those who use them for medical treatment.

2

wholesale companies, produce fraudulent paperwork, and professionally package and ship the medicines to their pharmacy customers. To accomplish this, co-conspirators establish shell corporations and bank accounts purportedly controlled by nominee individuals, which agents refer to as "straw owners" because, beyond lending their names, personal identifying information and signatures, the nominees do not otherwise exercise control over the activities involving the companies or bank accounts. Instead, these straw owners are paid to have their names, information and signatures used so that the scheme can be carried out and so that the co-conspirators directing the scheme (as well as the scheme itself) can remain hidden from law enforcement. The straw owners have a general understanding that their identities are being used for some unlawful scheme but typically do not know the full extent of the scheme and, in exchange for payment for their participation, act at the direction of other co-conspirators.

9. The fraudulent paperwork also includes falsified pedigrees, which are required documents prepared by legitimate pharmaceutical manufacturers and wholesalers that identify the products and batch numbers of pharmaceuticals, describe their dates of manufacture and origin, indicate who purchased them, show when and where they were shipped, how they were purchased, and other information needed to trace them through the whole marketing chain if anyone needs to check on their legitimacy and pedigree.

10. In or about May 2019, law enforcement conducted searches of warehouses in Arizona and Washington that were operated by LLC Wholesale Supply LLC (hereinafter "LLC") and Wholesalers Group, LLC (hereinafter "WG"), respectively. Law enforcement seized thousands of bottles of diverted pharmaceuticals and thousands of false pedigrees as a result of those searches.

11. On October 17, 2019, a Grand Jury sitting in the Southern District of Florida returned an indictment against four defendants, charging them with committing multiple violations for their participation in this prescription diversion scheme, including money laundering in violation of Title 18, U.S.C., Section 1956(h), and mail fraud, in violation of Title 18, U.S.C., Section 1341. *See United States v. Joles, et al.*, 19-CR-20674-DPG. Two of the defendants (Joles and Salemi) were the CEOs of LLC and WG. The other two defendants (Caminero Alvarez and Herrera) were nominal CEOs of companies that purportedly sold pharmaceuticals to LLC and WG and had signatory authority over bank accounts where money from the sales was received and then quickly funneled out to other accounts and ultimately withdrawn as cash. Based on my training, experience and knowledge of this investigation, I believe that Caminero Alvarez and Herrera were straw owners who were paid to participate in the conspiracy.

## II.  CAMBARA's Money Laundering Activities and Involvement in the Scheme

12. During the investigation, agents noticed that other companies that were selling pharmaceuticals to LLC and WG and other bank accounts that were receiving money from those sales were purportedly controlled by CAMBARA. Agents believed that CAMBARA was a straw owner similar to those named in the above-referenced indictment, which beliefs were confirmed by an interview with CAMBARA (as discussed in more detail below).

13. Furthermore, the evidence showed that the money being funneled through the bank accounts nominally controlled by CAMBARA were proceeds from the same criminal prescription diversion scheme that was the subject of the *Joles et al.* indictment discussed above. That scheme involved wire fraud because the money wired to the bank accounts was obtained through false representations that the pharmaceuticals being sold were not misbranded, adulterated or otherwise

4

diverted, as well as instances of mail fraud when diverted pharmaceuticals were sent to LLC or WG by commercial interstate carriers.

14.     In September 2019, law enforcement interviewed CAMBARA regarding those companies and bank accounts. After agents identified themselves to CAMBARA, he stated, in sum and substance, that he knew why they were there and that he had not been able to sleep for months because he was expecting law enforcement to visit him. CAMBARA stated that the agents were going to ask him about the companies and bank accounts he had opened. When agents confirmed that to be the case and asked CAMBARA to explain his involvement, CAMBARA stated he was an Uber driver and, in mid-2018, he was offered the opportunity to make some money by another Uber driver. He accepted the offer and, several days later, received a package on his front door step with a cheap cellular telephone inside. The telephone had already been activated and had a note directing him to call a certain number. He followed the instructions and reached an individual he knew only as "Tony." CAMBARA continued interacting this way with Tony for almost a year, receiving a new cheap cellular telephone on his door step every so often and with regularly changing numbers for Tony.

15.     At Tony's instruction, CAMBARA, among other things, registered several companies and opened approximately 12 bank accounts. CAMBARA admitted that he was aware that these companies and bank accounts were opened to move money around and he would sometimes receive specific instructions to go to a bank or check cashing store and engage in transactions. However, CAMBARA explained that he also provided Tony the debit cards from the accounts, as well as online login information and checks, and thus CAMBARA was aware that financial transactions were being conducted even without him. CAMBARA stated that he earned

5

approximately five percent for moving money through the accounts and estimated that to be about $50,000 over the course of his dealings with Tony.

16. CAMBARA's statements regarding the operations of the bank accounts and instances where he would have to go to a bank or check cashing store to engage in a transaction are corroborated by the bank documents and check cashing store video surveillance that agents have obtained.

17. CAMBARA further stated that he remembered, sometime in early or mid-2019, one of the banks froze the money in an account and CAMBARA was then instructed by Tony to go to a certain address, pick up some fake invoices, and provide those to the bank in an effort to un-freeze the account. CAMBARA stated that he did as instructed, though he is unsure if the account was ever un-frozen.

18. CAMBARA stated that one of his last interactions with Tony, which occurred in approximately mid-2019, involved an instruction for CAMBARA to meet an unidentified male at a check cashing store where, with CAMBARA's help and signature, the unidentified male was able to cash two checks. Tony thereafter advised CAMBARA to discard the cellular telephone that was provided. Tony further advised CAMBARA that it would be wise for him to return to Cuba, which is CAMBARA's country of citizenship.

19. Although CAMBARA stated that he was uncertain as to the source of the funds that were being transferred, based on my training, experience and knowledge of this investigation – including CAMBARA's use of multiple cellular telephones, the purposely hidden identity of Tony and his changing numbers, the frozen account and use of fake invoices to try to un-freeze the account, the provision of online passwords, checks and debit cards to Tony, interactions with an unidentified male to cash checks, Tony's advice that CAMBARA return to Cuba, and

CAMBARA's concern that law enforcement would come looking for him, I believe that CAMBARA was aware that the actions in which he was engaging were somehow unlawful and that the money involved in the transactions was the proceeds of some kind of unlawful activity.

## CONCLUSION

Based upon the information provided above, I respectfully submit that probable cause exists to believe that from in or around January 2013 and continuing to May 28, 2019, Adrian CAMBARA ORTIZ, and others knowingly and willfully combined, conspired, and agreed with each other and with others to commit offenses against the United States in violation of Title 18, United States Code, Section 1956.

Based upon the information provided above, I further respectfully submit that the specified unlawful activity was mail fraud and wire fraud, in violation of Title 18 U.S.C. §§ 1341 and 1343.

Respectfully submitted,

_____
JANELLE RUDIE, SPECIAL AGENT,
U.S. FOOD AND DRUG ADMINISTRATION

Sworn and subscribed before me
this 30th day of October, 2019.

_____
THE HON. JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

7