## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-20674-CR-GAYLES

**UNITED STATES OF AMERICA**

**vs.**

**ELADIO VEGA,**

      **Defendant.**

_____/

### FACTUAL PROFFER

The United States of America and defendant ELADIO VEGA ("Vega") hereby stipulate and agree to the following facts, which form the basis for the defendant's plea of guilty to Count 2 of the Fourth Superseding Indictment, charging him with conspiracy to traffic in altered and misbranded drugs.   The defendant stipulates that the United States could prove these facts beyond a reasonable doubt at trial.

1.      During the time period of the charged conspiracy, Vega was associated with co-defendant Lazaro Hernandez.   Hernandez was in the business of selling what are known as "diverted pharmaceuticals."

2.      The business of diverted pharmaceuticals involves the illegal purchase and sale of prescription pharmaceuticals, primarily drugs for treatment of HIV, cancer, and psychiatric illnesses.   The medicines are acquired through health care fraud or bought from patients to whom they are prescribed but who forgo their use and instead choose to sell them.   The diverted drugs are then aggregated, cleaned, packaged, and resold, with fraudulent documentation purporting them to have been supplied directly from manufacturers or from legitimate pharmaceutical

wholesalers.   The scheme includes the creation of false "pedigrees," which are documents that are legally required to show the origin and all sales and transfers of prescription pharmaceuticals.

3.      During the time period of 2013 through mid-2016, Hernandez was supplying quantities of diverted pharmaceuticals to co-defendant Stephen Costa, who was arranging for them to be delivered, through shell companies, to co-conspirators Mohammad Salemi and Frank Alvarez, among others.   Vega assisted Hernandez in this business, and was aware of his use of shell companies for the sales.   The conspirators who received the diverted drugs through Costa shipped them to their customers through an interstate carrier, accompanied by fraudulent pedigrees.

4.      In mid-2016 Costa had to report to prison to serve a sentence from a previous case involving similar offenses.   Before he surrendered, Costa introduced Hernandez to Frank Alvarez, so that they could continue doing the same business.

5.      Hernandez and Vega had learned that Alvarez, Salemi, and other conspirators had been selling most of the diverted drugs they had been providing to Joshua Joles, who operated LLC Wholesale Supply LLC in Tempe, Arizona.

6.      In January, 2017, Salemi arranged a social get-together of the various conspirators, at the One Hotel in Miami Beach.   Vega attended the gathering and introduced himself to Joles. Vega told Joles that his "Godfather," referring to Hernandez, could supply large quantities of the same type of drugs that Joles had been getting from Salemi and Alvarez, including the falsified pedigrees.   He offered a price of 17% below wholesale acquisition cost.   Wholesale acquisition cost is the pharmaceutical industry standard for the lowest legitimate wholesale price.   Prices 17% below that level were necessarily not being sold legally.

7.      Joles agreed to deal directly with Vega and Hernandez.   This arrangement would

cut out Salemi and Alvarez as the middle-men and allow both parties to increase their profit margins. Vega told Joles that he would be contacted by people describing themselves as friends of his, using Vega's nickname of "E."

8. Thereafter, a number of people contacted Joles over a period of time, referring to themselves as "friends of E" or making similar references, and offering to sell Joles diverted pharmaceuticals. The first of them was Gustavo Linares. Joles agreed to do business with him and began buying quantities of such drugs from him. The sales took place through shell companies that had been set up in concert with Hernandez and Vega. Some of these companies were LDD, Care Pro, A1A and Eastern Distributors.

9. Vega was paid a commission on each of the sales of diverted pharmaceuticals that were made by the companies that he had connected to do business with Joles. As a result, he directly profited in the amount of at least $ 200,000 from his role on the offense.

10. In March, 2018, Vega met Joles at a hotel in Las Vegas. He told him that additional people would be reaching out to him to offer diverted drugs. Vega also gave Joles a pre-paid cellphone and instructed him to use it exclusively for their business communications. Additional contacts referring to Vega as "E", or in similar code, resulted in Joles obtaining diverted drugs from other sources who were put in touch with him by Vega.

11. During the time period from around 2015 through 2018, Kadir Diaz had been working with Mohammad Salemi and Frank Alvarez in the diverted drug business. However, Diaz had taken control of a pharmaceutical wholesale company in April 2016 which was being supplied by Alvarez and Salemi. In September, 2018, Vega met with Diaz and Joles and introduced Diaz to Joles as a person who could sell diverted drugs directly to him. This allowed the participants to cut out Alvarez and Salemi as middle-men in their deals.

3

12.     The total amount of money that Joles paid for diverted pharmaceuticals that had been sourced from Hernandez and Vega, or sold to Joles by others whom they had put into contact with Joles, was approximately $33 million.   This sum represents a fair estimate of the value of diverted drugs illegally sold during the course of the conspiracy for which Vega was responsible.

**ELADIO VEGA**
DEFENDANT

**FRANK H. TAMEN**
ASSISTANT U.S. ATTORNEY

**GEORGE PALLAS**
DEFENSE COUNSEL

5-10-23
**DATE**