UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20674-DPG

UNITED STATES OF AMERICA,

     Plaintiff,

v.

BORIS ARENCIBIA

     Defendant.

_____/

## MOTION TO REOPEN DETENTION HEARING PURSUANT TO *18 U.S.C. § 3142(f)(2)*

     Defendant, BORIS ARENCIBIA ("Mr. Arencibia"), through undersigned counsel and pursuant to *18 U.S.C. § 3142(f)(2)*, hereby moves this Court to Reopen his Detention Hearing and impose conditions of release, and states as follows:

     An Indictment was returned against Defendant Boris Arencibia charging him with Conspiracy to Deliver Misbranded and Adulterated Drugs (Count 1); Conspiracy to Traffic in Medical Products with False Documentation (Count 2); and Conspiracy to Commit Money Laundering (Count 3).

     On February 7, 2024, a detention hearing was held wherein this Honorable Court granted the Government's Motion for Pretrial Detention, finding that the Government met its burden that Mr. Arencibia posed a risk of flight. The Court denied the Government's request for detention based on danger to the community, finding that the Government had not met its burden on that prong. A copy of the transcript of the detention hearing is attached as ***Exhibit A***.

     The Defendant incorporates by reference all arguments and evidentiary exhibits introduced at the detention hearing of February 7th, 2024. At the hearing, the Government offered testimony



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

of two agents who testified having taken statements from cooperating witnesses about Mr. Arencibia's connections to the Cuban government and his involvement in organizing the Santa Maria Music Festival in Cuba in the Summer of 2023.  Although the Court recognized the agents' testimony was based on multiple levels of hearsay, the Court expressed concerns with the "unique set of circumstances" it faced with a defendant that appears to have alleged strong ties to the Cuban government. *Detention Hearing Transcript, February 7, 2024,* at 98: 22-25 (**Exhibit A**).  The Court accepted the agents' testimonies about Mr. Arencibia's ties to the Cuban Government and an uncorroborated alleged "Plan B" [to flee to Cuba] because the testimony was "substantiated by the undisputed fact that he [Mr. Arencibia] was able to **conduct business, promote, and profit from something that occurred in Cuba** as recently as this summer." *Id.* at 99:1-4 and 100:25-101:7 (emphasis added). The Court clarified there was no finding that Mr. Arencibia had violated any U.S. law, but, noted "that his participation could not have occurred but for his approval by the Cuban government."  *Id.* at 21-25.

Based on the foregoing, on March 1, 2023, the Court entered a Detention Order, granting the Government's request for detention of Defendant based on Defendant's "unique circumstances supporting his ties to Cuba," which "presents a serious risk of nonappearance." [DE 892 at 6].  The Court noted that the Defendant has significant political ties to Cuba including with Raul Castro's grandson and highlighted "Defendant's **ability to coordinate and promote the music festivals in Cuba last summer**.  . . . and the circumstances of Defendant's **ability to conduct business within Cuba are concerning**." [DE 892 at 6] (emphasis added).

Mr. Arencibia respectfully requests that this Court reconsider the denial of his pretrial release based on the attached Affidavits of Santiago Agudelo Quiros and Hector Diaz Yanez who can clarify that Mr. Arencibia was not involved in organizing or promoting this event, did not

receive any money as a result of this event, and that his involvement in the Santa Maria Music Festival the Summer of 2023 was strictly limited to facilitating the participation of some artists whom he (Arencibia) represented. This information was not available to the undersigned at the time of the hearing and has a material bearing on in determining whether there are conditions of release that will reasonably assure the Defendant's appearance at all future court proceedings.

## **AFFIDAVITS**

In support of his Motion to Reopen the Detention Hearing, Mr. Arencibia offers the affidavits of (1) Santiago Agudelo Quiros ("Mr. Quiros"), whose company, Blank Canvas Hospitality S.L., a Spanish company, organized the Santa Maria Music Fest on Cayo Santa Maria in Cuba; and (2) Hector Diaz Yanez who is the President of Soluciones Integrales QBA.

Mr. Quiro's affidavit states in part:

- o Boris Arencibia had no involvement whatsoever in organizing the Santa Maria Music Festival.

- o Blank Canvas was the only organizing company.

- o As part of the event production, Soluciones Integrales Cuba was contracted. Soluciones Integrales in turn subcontracted the services of several artists managed by "Caribe Promotions."

- o Boris Arencibia is the President of Caribe Promotions.

- o M. Arencibia's Involvement with the Santa Maria Music Festival was limited to facilitating the participation of artists on behalf of Blank Canvas Hospitality.

Affidavit of Mr. Santiago Agudelo Quiro (redacted) attached as ***Exhibit B***.[1]

Mr. Diaz Yanez's affidavit provides:

- o Black Canvas Hospitality SL, the creator and executive producer and organizer of the Santa Maria Music Festival, in Cayo Santa Maria, Cuba, hired Soluciones

---

[1] The attached Affidavits are redacted to protect the witnesses' personal information. The undersigned will provide the Government and the Court unredacted copies at the hearing, if one is granted.



Integrales QBA to handle the technical production, marketing, and hiring of local and international talent.

o   Soluciones Integrales, in turn, sought out Defendant Boris Arencibia of Caribe Promotions, who represents international artists, to obtain the artists' participation at the festival.  Mr. Arencibia's role was to facilitate the artists' participation in the festival.

o   Mr. Arencibia was not paid by Soluciones Integrales QBA.

Affidavit of Mr. Hector Diaz Yanez attached as **Exhibit C**.

Mr. Arencibia respectfully requests this Court reopen the pretrial release hearing based on the newly filed Affidavits which clarify his role in the festival was limited to facilitating the acquisition of the talent, and that he was working with a Spanish company (Black Canvas Hospitality SL) and a United States resident.

In further support of this Motion, Mr. Arencibia submits the below Memorandum of Law.

### <u>MEMORANDUM OF LAW</u>

A detention hearing

may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

*18 U.S.C. § 3142(f)(2).*  The Court's concern about Mr. Arencibia's perceived ties to Cuba; particularly his "involvement" in the Santa Maria Music Festival in Cuba during the Summer of 2023, and the belief "that his participation in it could not have occurred but for his approval by the Cuban government," is clear in the Record and the Court's Order.  *Detention Hearing Transcript, February 7, 2024,* at 100:21-24; *see also* [DE 892 at 6].

Contrary to what was represented, Mr. Arencibia's only connection to the Santa Maria Music Festival is his representation and relationship with the artists, his clients. Beyond the agents'



QUINTERO BROCHE™

75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

testimony, which was based on uncorroborated hearsay statements of a cooperating individual(s), the Government did not present any evidence that Mr. Arencibia is a flight risk. The evidence presented established that Mr. Arencibia did not organize the event, did not attend the event, and was not paid for any involvement he had in facilitating the acquisition of talent for the event.

Nevertheless, it is OFAC; namely the United States through OFAC Regulations, who authorizes U.S. nationals to engage in certain activities in Cuba. Travel-related transactions to, from, and within Cuba for the purpose of public performances by persons subject to the jurisdiction of the United States. *See* 31 U.S.C. §515.560 (a)(7) & (c). Section §515.567(b) applies to "transactions directly incident to participation in or organization of a public performance, clinic, workshop, . . . or exhibition in Cuba by participants in or organizers of such activities, provided that the event is open for attendance, and in relevant situations, participation, by the Cuban public." 31 C.F.R. §515.567(b).

The Government did not present clear and convincing evidence that Mr. Arencibia will not appear in this action if released.  Mr. Arencibia should not be detained for the work that he does on behalf of his clients; particularly, where there was nothing illegal about the event.

WHEREFORE Defendant, BORIS ARENCIBIA,  respectfully requests that this Honorable Court grant his Motion to Reopen the Detention Hearing based on the attached Affidavits which refute the basis for finding Mr. Arencibia is a flight risk, and thus impose conditions of release, and grant such other relief as the court deems appropriate.

Respectfully submitted,

**QUINTERO BROCHE, P.A**.

*Attorneys for Boris Arencibia*
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel: (305)446-0303
Fax: (305)446-4503

By: /s/    Frank Quintero, Jr.
     FRANK QUINTERO, Jr.
     FLORIDA BAR NO.: 399167

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 15, 2024, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

Respectfully submitted,

**QUINTERO BROCHE, P.A.**
*Attorneys for Boris Arencibia*
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel: (305)446-0303
Fax: (305)446-4503

By: /s/    Frank Quintero, Jr.
     FRANK QUINTERO, Jr.
     FLORIDA BAR NO.: 399167

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 19-CR-20674-DPG
 3
     UNITED STATES OF AMERICA,
 4                                        Miami, Florida
                   Plaintiff(s),
 5                                        February 7, 2024
             vs.
 6
     BORIS ARENCIBIA,
 7
                   Defendant(s).      Pages 1 - 103
 8   ------------------------------------------------------------

 9                   ARRAIGNMENT/DETENTION HEARING
                 TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10             BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
                   UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):  FRANK TAMEN, ESQ.
13                          UNITED STATES ATTORNEY'S OFFICE
                            99 NE 4th Street
14                          Miami, FL 33132
                            305-961-9000
15                          frank.tamen@usdoj.gov

16

17   FOR THE DEFENDANT(S):  FRANK QUINTERO, JR., ESQ.
                            QUINTERO BROCHE, P.A.
18                          75 Valencia Avenue
                            Coral Gables, FL 33134
19                          305-446-0303
                            fquintero@quinterolaw.net
20

21

22   TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
23                          jemancari@gmail.com

24

25
```

```
 1    Thereupon,

 2    the following proceedings were held:

 3            THE DEPUTY CLERK:  Turning to page 2 of the calendar,

 4    calling United States v. Boris Arencibia, case No. 19 20674,

 5    criminal, Judge Gayles.

 6            Counsel, please announce your appearances for the

 7    record.

 8            MR. TAMEN:  Good morning, your Honor.  Frank Tamen

 9    representing the United States.

10            THE COURT:  How are you, Mr. Tamen?

11            MR. TAMEN:  Very good.  Thanks, Judge.

12            MR. QUINTERO:  Good morning, your Honor.  Frank

13    Quintero on behalf of Mr. Arencibia.

14            THE COURT:  Can I confirm -- oh my gosh, I want to say

15    this right -- Arencibia?

16            THE DEFENDANT:  Yes, perfect.

17            THE COURT:  So is the device working?  Do you hear the

18    interpreter?

19            THE DEFENDANT:  Yes, your Honor.

20            THE COURT:  Terrific.  Keep me posted if it goes out

21    on you, just so I can see it.

22            Mr. Quintero is permanently in.  Is that for trial

23    purposes only, Mr. Quintero?

24            MR. QUINTERO:  Yes, your Honor.

25            THE COURT:  And you've explained to your client that
```

1   should he take an appeal in this case you will file the notice

2   of appeal for him but he is responsible for obtaining his own

3   appellate counsel, which might be you, but it is not under this

4   scope of representation?

5            Do you understand that as well, Mr. Arencibia?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  OK.  Then are you ready to arraign your

8   client?

9            MR. QUINTERO:  I am, your Honor.

10            THE COURT:  Let's do that first then.

11            MR. QUINTERO:  I received a copy of the superseding

12   indictment, the fifth superseding indictment, your Honor.  We

13   waive reading of the indictment, enter a plea of not guilty as

14   to all counts, ask for trial by jury, and ask the court to

15   enter the standing discovery order.

16            THE COURT:  The court will accept that not guilty

17   plea, and we have entered the standing discovery order.

18            Your case has been indicted before Judge Gayles and so

19   I might see you again, but I'll refer you to him for all future

20   scheduling and proceedings, including a jury trial, if any.

21            With that, are we ready for our pretrial detention

22   hearing?

23            MR. QUINTERO:  I'm sorry, your Honor?

24            THE COURT:  Are we ready for our detention hearing?

25            MR. QUINTERO:  We are, your Honor.

1              MR. TAMEN:  We are.

2              THE COURT:  OK.

3              MR. TAMEN:  Your Honor, the government is proceeding

4      both on risk of flight and on danger to the community.

5              I just want to call witnesses in order to present the

6      government's case.

7              THE COURT:  That's fine.  Let me make sure, because

8      this is -- I'm looking at the statutes charged, and when you

9      say danger to the community, you're traveling under 3142(f)(2)

10     for witness tampering, essentially.

11             MR. TAMEN:  Yes.

12             THE COURT:  OK.  All right.  You want to make your

13     case by calling witnesses and not a proffer?

14             MR. TAMEN:  Correct.  Yes.

15             THE COURT:  Great.

16             MR. TAMEN:  The United States calls special agent

17     Andrew Escobedo.

18             MR. QUINTERO:  Your Honor, may I sit down and have

19     Mr. Arencibia sit in the box, where I can take notes?

20             THE COURT:  That's fine.  Yes.

21             PUBLIC DEFENDER:  Your Honor, may the public defender

22     be excused from the remainder of the morning?

23             THE COURT:  Yes.

24             PUBLIC DEFENDER:  Thank you, Judge.

25             MR. TAMEN:  Judge, let me start with two exhibits.  I

Escobedo - Direct

1    will provide the originals to the court and copies to --

2    defense counsel already has copies, and I will provide copies

3    to the witness.

4              THE DEPUTY CLERK:  Please raise your right hand.

5              Do you solemnly swear or affirm that the testimony you

6    are about to give will be the truth, the whole truth, and

7    nothing but the truth so help you God?

8              Thank you.  Please be seated.

9              Speak into the microphone.  State your name.  Can you

10   spell your first and last name for the record and tell us where

11   you're employed.

12             THE WITNESS:  I am special agent Andrew Escobedo.

13   First name A-N-D-R-E-W.  Last name Escobedo, E-S-C-O-B-E-D-O.

14   I am a special agent with Homeland Security Investigations.

15             THE COURT:  I missed your last name.  E-S-C-O-B-E?

16             THE WITNESS:  D-O.

17             THE COURT:  OK.  I have no proffer so I have no

18   context for what is important from your testimony.

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  So do me a favor and just speak a little

21   bit slowly because I'm taking notes --

22             THE WITNESS:  Yes, ma'am.

23             THE COURT:  -- and trying to keep up.

24   DIRECT EXAMINATION

25   BY MR. TAMEN:

Escobedo - Direct

1  Q   OK.  What are your duties as a special agent with Homeland

2  Security at the current time?

3  A   Our primary duties is to investigate federal crimes in

4  violations of Title 8, immigration title, and Title 19, which

5  is Customs violations.

6  Q   And are you familiar with the means by which people travel

7  to and from the United States both legally and illegally?

8  A   Yes, sir.

9  Q   OK.  I have placed in front of you Government Exhibit 1,

10  which is a document in Spanish.

11         Can you tell us -- OK.  I'm sorry.

12         Can you tell us what that exhibit is.

13  A   Exhibit 1 is an official document from the government of

14  Cuba with travel dates for Mr. Boris Arencibia.  They have two

15  travel dates here.  One from back in 1998 when he left Cuba to

16  the Bahamas and then again in 2016 when he traveled to Mexico

17  and returned to Cuba.

18  Q   Are you looking at Government Exhibit 1 or 2?

19  A   One.

20  Q   OK.  That is from the Ministry of the Interior of Cuba?

21  A   Yes, sir.  Ministry of Interior of Cuba, yes.

22  Q   Now let me ask you what Government Exhibit 2 represents.

23  A   Exhibit 2 is from the government of Mexico.  It confirms

24  the government of Cuba's paperwork that Mr. Arencibia arrived

25  in their country in 2016, stayed about three weeks, and

Escobedo - Direct

1    returned back to Cuba, confirming the Ministry of Interior from

2    Cuba's travel documents.

3    Q    Sir, what does this indicate to you about the defendant's

4    international travel?

5    A    It confirms from two different entities, both official

6    documents, both from Cuba and Mexico, that Mr. Arencibia was in

7    Cuba in 2016, traveled to Mexico in 2016, and returned to Cuba.

8    Q    And do these documents also indicate Mr. Arencibia having

9    residency in the country of Mexico?

10   A    It does.  In the government of Mexico document it says that

11   Mr. Arencibia is a permanent resident of Mexico.

12   Q    Are you aware of Mr. Arencibia's status in the United

13   States?

14   A    I am.  Mr. Arencibia here is on a parole with mandatory

15   reporting with ICE's Enforcement and Removal Operation Section.

16   He's supposed to report every year on the year, which he has

17   been doing but missed his appointment this year.

18   Q    And under his conditions of parole, is he allowed to travel

19   to foreign countries?

20   A    No, he is not.  He is not allowed to travel to foreign

21   countries without permission of the United States government.

22   Q    Is Cuba particularly of concern if he travels there?

23   A    Yes.  So basically, since he has ties to Cuba and since

24   Cuba's proximity to the United States, it's easy for him to get

25   to Cuba; however, he did not ask permission from the United

Escobedo - Cross

1   States government to travel to Cuba.

2   Q    And does this travel to a foreign country, especially from

3   Mexico to Cuba and back, jeopardize or have any effect on his

4   parole in the United States?

5   A    Yes.  It negates his parole.  Unfortunately, or fortunately

6   for him, because of his status as a Cuban national he is not

7   allowed to be deported back to Cuba.  So he is just in limbo

8   here in the United States.  But it does negate -- if he was

9   from another country, it would negate his parole and he would

10  be deported to that country.

11  Q    And if the government of Cuba underwent some rapid change

12  and a different leadership took over there, would that result

13  in his deportation?

14  A    Absolutely.

15  Q    Would he also be deportable to Mexico as a permanent

16  resident there?

17  A    That would be negotiated with the government of Mexico, but

18  that is a possibility because he is a permanent resident over

19  there, yes, sir.

20          MR. TAMEN:  Your Honor, I tender this witness for

21  cross-examination.

22          THE COURT:  Mr. Quintero.

23          MR. QUINTERO:  Thank you.  If it please the court.

24  CROSS-EXAMINATION

25  BY MR. QUINTERO:

Escobedo - Cross

1    Q    Agent Escobedo --

2    A    Yes, sir.

3    Q    -- you and I have never spoken before, correct?

4    A    No, sir.

5    Q    And as an agent for Homeland Security, you have access to

6    certain documents like you've talked about concerning travel

7    records and these types of things --

8    A    Yes, sir.

9    Q    -- for immigration issues, correct?

10   A    Yes, sir.

11   Q    You said that the first travel according to that document

12   was in 1998.

13   A    This is for the government of Cuba, sir, not our systems.

14   Q    I understand.  The document reflects travel on a certain

15   date in 1998 to the Bahamas, correct?

16   A    Yes, sir.

17   Q    All right.  What is the date of travel in that document?

18   A    It says here that he left in 1998, so May 14th, and came

19   back May 24th.

20   Q    All right.  So he was gone ten days?

21   A    Yes, sir.

22   Q    And returned to the United States?

23   A    No, returned to Cuba, sir.

24   Q    Returned to Cuba.  All right.

25        Are you aware that Mr. Arencibia at that time had a

Escobedo - Cross

 1  permit to travel?

 2  A   Yes, sir.

 3  Q   All right.  Let me show you what has been marked -- I am

 4  going to work my way backwards, Judge -- Defendant's Exhibit 7.

 5  It is actually Composite 7.  The second page provides some

 6  detailed information concerning permit to travel.

 7  A   I understand this, sir.  Yes, sir.

 8  Q   So can we agree that he had permission to travel outside

 9  the United States in June of -- up to June, I believe it's

10  24th --

11  A   Yes.

12  Q   -- of 1998, I believe?

13  A   Yes.

14  Q   So his travel in 1998 was perfectly legal, correct?

15  A   In 1998, yes, sir.

16  Q   All right.  I just want to be clear.

17          Now, do you have any information other than what is on

18  that document concerning the travel in 2016?

19  A   So that was the peculiar item in the situation.  There is

20  no travel records of Mr. Arencibia on our systems that he left

21  in 2016.  So that tells me two things, right.  That, one, he

22  fled under a fraudulent document, right, because all our

23  systems are up to date on the minute, right.

24  Q   Right.

25  A   So he left to Cuba without getting permission from the

Escobedo - Cross

1    United States government to go to Cuba.  There is no travel

2    records.  So like I said, that tells me two things.  One, he

3    either went to Cuba on a fraudulent document or crossed into

4    Mexico.  Because he is a permanent resident Mexico would let

5    him in.  However, he still did not get permission from the

6    United States government.

7    Q   All right.  But at some point you know that Mr. Arencibia

8    returned to the United States, correct?

9    A   Also, which leads to the second part, is that he entered

10   the United States under, most likely, fraudulent documents as

11   well, sir.  Yes, sir.

12   Q   Or with no documents?

13   A   Or with no documents.  However, because he's been in our

14   system, sir, they would -- if he came into our country without

15   documents, they would have done biometrics and he would have

16   popped up, yes, sir.

17   Q   All right.  But the point is that he did return to the

18   United States, correct?

19   A   Yes, sir.

20   Q   And apparently his stay, from what these documents reflect,

21   was he was there for about 30 days or so, correct?

22   A   He was in Mexico for about three to four weeks, yes, sir.

23   Q   Three weeks.  OK.  All right.

24            MR. QUINTERO:  I have nothing else, your Honor.

25            THE COURT:  I have no questions.

Lanthorn – Direct

 1              MR. TAMEN:  No further questions, your Honor.

 2              I just direct the court's attention to the Pretrial

 3    Services report in which the defendant told his Pretrial

 4    Services officer that he had made no international trips within

 5    the last ten years.

 6              THE COURT:  I noticed.

 7              (Witness excused)

 8              THE COURT:  Who is your next witness?

 9              MR. TAMEN:  The United States calls Matthew Lanthorn.

10              THE DEPUTY CLERK:  Please raise your right hand.

11              Do you solemnly swear or affirm that the testimony you

12    are about to give will be the truth, the whole truth, and

13    nothing but the truth so help you God?

14              THE WITNESS:  I do.

15              THE DEPUTY CLERK:  Thank you, sir.  Please be seated.

16              Speak into the microphone.  State your name.  Can you

17    spell your first and your last name for the record and tell us

18    where you're employed.

19              THE WITNESS:  Matthew Lanthorn.  M-A-T-T-H-E-W.  Last

20    name is L-A-N-T-H-O-R-N.  I'm employed by the FBI as a special

21    agent.

22    DIRECT EXAMINATION

23    BY MR. TAMEN:

24    Q   Agent Lanthorn, are you one of the case agents on the

25    indictment against Boris Arencibia?

Lanthorn - Direct

1    A    I am.

2    Q    And have you been working on this case since its inception

3    back in 2019?

4    A    I have.

5    Q    Have you received information from law enforcement

6    confidential sources relating to Mr. Arencibia?

7    A    I have.

8    Q    About how many have spoken directly to you about him

9    relating to some of his illegal activities?

10   A    Approximately three of them.

11   Q    And have all of them track records of proven reliability in

12   providing accurate information in other matters?

13   A    Yes, they have.

14   Q    Let me ask you if you've heard about, not just from sources

15   but from other means, a connection between Boris Arencibia and

16   an individual known by the name of Angel Millones.

17   A    I have.

18   Q    What can you tell us about Angel Millones?

19   A    Angel Millones, also known as -- I guess his true name was

20   Angel Ayala-Vazquez -- was essentially a kingpin drug dealer in

21   Puerto Rico for 15 years, arrested in 2011.

22   Q    Was he known for violence?

23   A    Yes, very violent.

24   Q    After his arrest, did the government of Puerto Rico have to

25   take any measures to restore order to the area where he had

Lanthorn – Direct

1  been dealing?

2  A   Yes.  He essentially ran two public housing projects in

3  Puerto Rico and they had to use the National Guard to kind of

4  restore order so there would stop being as much violence.

5  Q   OK.  Was he convicted in 2011?

6  A   I believe it was in 2011 or shortly thereafter.

7  Q   And he's been in prison since then?

8  A   Yes.

9  Q   Is this defendant, Boris Arencibia, a well-known music

10  promoter in the Miami area?

11  A   Yes, he is.

12  Q   And is he also active, very active on social media?

13  A   Incredibly active.

14  Q   OK.  Now let me direct your attention to February of 2023,

15  approximately a year ago.

16       Did the defendant do a YouTube video relating to Angel

17  Millones?

18  A   Yes, it appears that he did.  It was posted to YouTube in

19  February of 2023.

20       THE COURT:  If I need to know the person's name, will

21  you spell it for me?

22       THE WITNESS:  Yes.  Angel Millones.

23       THE COURT:  OK.

24       THE WITNESS:  A-N-G-E-L, M-I-L-L-O-N-E-S.

25       THE COURT:  OK.

Lanthorn – Direct

```
 1            MR. QUINTERO:  Judge, if I may, is that a nickname or
 2   is that the gentleman's real name?
 3            THE WITNESS:  That is his nickname.  I said his real
 4   name earlier.
 5            MR. QUINTERO:  Could you spell the last name, the real
 6   last name of this Angel individual.
 7            THE WITNESS:  A-Y-A-L-A – Vasquez, V-A-S-Q-U-E-Z.
 8            THE COURT:  Can we agree to use one name or the other
 9   for him, whichever one --
10            THE WITNESS:  Angel Millones is how everybody knows
11   him.  That's how he's referred to in music videos.
12            THE COURT:  OK.  All right.  So we will all understand
13   when the agent says Millones.  OK.
14   BY MR. TAMEN:
15   Q   Tell us about that YouTube video.  What did it involve?
16   A   It appears to show Mr. Arencibia and his wife traveling to
17   Puerto Rico on a private jet, chartered from Florida, where
18   they then go into the projects, that were normally occupied by
19   Millones and his crew, and hand out gifts to the poor and then
20   show support for what was his former drug organization, some of
21   his people that had been locked up.  It's a lengthy video in
22   Spanish, and then it is a concert that he puts on there with
23   some of his musicians to support.
24   Q   Was that concert supposed to benefit a particular
25   individual in the Millones organization?
```

Lanthorn – Direct

1   A    I believe it was one of his members that had just been

2   arrested recently.  One of the criminal enterprise members had

3   just been arrested.

4   Q    Now, moving on to another subject, have you reviewed police

5   reports of two incidents in which the defendant was arrested

6   for violent crimes?

7   A    I have.

8   Q    Let me start with the first incident in 2018, an arrest by

9   the Miami police department.

10          Based on your review of the police reports, can you

11   tell us what took place and where it occurred.

12   A    Two individuals were in a bar in Miami where they were

13   apparently confronted by the defendant Boris Arencibia and a

14   melee ensued where they were struck with, it looks like chair

15   legs and bottles and fists.

16   Q    And who was it that was doing the striking?

17   A    Boris Arencibia.

18   Q    What kind of bottle did he use?

19   A    Champagne bottle.

20   Q    Did one of the victims get hit in the head with it?

21   A    He did, and I believe he had stitches.  He got cut on his

22   cheek too.

23   Q    And what about the second victim?

24   A    The second victim also had contusions and head swelling.

25   Q    Was the second victim also hit with the bottle?

1    A    Yes, he was.

2    Q    By the defendant?

3    A    Yes, he was.

4    Q    Now, moving on to the second incident in September of 2023,

5    which was reported by the Miami-Dade Police Department, let me

6    ask you first about the backdrop for this incident.

7            Around that time period, was there a social media

8    controversy relating to this defendant?

9    A    There was.

10   Q    And what was the nature of that?

11   A    The nature was that Mr. Arencibia had hosted a music

12   festival in Cuba, I believe in May of 2023, and upon the

13   conclusion of the festival he was accused by some of the Cuban

14   community of supporting Communism, since you can't host

15   anything in Cuba without the approval of the Cuban government,

16   in effect, that he was supporting the Cuban government.

17           The individual who had been assaulted was a Cuban

18   reggaeton artist who had allegedly accused Mr. Arencibia of

19   supporting the Cuban government.  So upon entering into the bar

20   Mr. Arencibia and another artist that he represents assaulted

21   the other artist and his wife over this.

22   Q    And how did that assault develop?  Tell us what happened.

23   A    Well, they started hitting him with, I believe, chair legs

24   and then another champagne bottle, or at least another bottle,

25   and they just, according to the victim, was just jumped by

Lanthorn - Direct

1   Mr. Arencibia.  They were verbalizing back and forth and then

2   he was assaulted.

3   Q   Was one of the victims a woman?

4   A   Yes.

5   Q   Did she also suffer injuries from this beating by the

6   defendant?

7   A   She did.  She had head contusions and lacerations on her

8   hand.

9   Q   And this is because --

10          THE COURT:  Mr. Tamen, can I just orient myself

11   because I don't see this on the Pretrial Services report.

12   Where did this occur?

13          MR. TAMEN:  This was in the La Mesa bar, which is the

14   September 2023 arrest.

15          THE COURT:  But it is not on the Pretrial Services

16   report.  Am I wrong?

17          MR. QUINTERO:  That is incorrect.  There was no arrest

18   in that case.  We have the followup reports, the supplementals.

19   The detective closed out the case.  No arrest.  So

20   Mr. Arencibia -- and I can explain.  I have a witness that will

21   explain this to the court, there was no arrest in that case

22   whatsoever.

23          THE COURT:  All right.  That is helpful.  So there was

24   a police report but not an arrest and that is why it is not on

25   the Pretrial Services report.

Lanthorn – Direct

1        MR. TAMEN:  Correct, yes.

2        THE COURT:  Thank you.

3        MR. QUINTERO:  There was actually, just for the

4   record, and I'll provide the court with all the reports, there

5   were actually competing reports.  In other words, there was the

6   version as testified by this agent and then there's the version

7   testified to or provided by Mr. Arencibia and the artist that

8   was injured in that case, who was represented by counsel, and

9   we can explain all that when it's our turn.

10       I want the court to be aware there was no arrest.

11  There is a closeout memo by the detective basically saying I'm

12  not arresting anybody; if you guys want something, go to the

13  State Attorney's Office.

14       THE COURT:  That was to be my next question.  Nobody

15  was arrested.

16       MR. QUINTERO:  Correct.

17       THE COURT:  Neither side.

18       MR. QUINTERO:  Correct.  Correct.

19       THE COURT:  All right.  I apologize, Mr. Tamen.  I

20  wanted to make sure I understood where we were.

21       MR. TAMEN:  No problem.

22  BY MR. TAMEN:

23  Q    Now, regarding the charges against Mr. Arencibia in the

24  current indictment, have there been multiple defendants in this

25  case who have cooperated, who have been interviewed, and who

Lanthorn - Direct

1    have testified against other conspirators and other people who

2    became defendants as a result of their cooperation?

3    A   Yes, there have.

4    Q   In other words, we've built a case on the basis of the

5    initial defendants rolling over and testifying against

6    subsequent defendants?

7    A   Yes.

8    Q   Have some of the witnesses who have been involved in the

9    investigation against Mr. Arencibia known him personally?

10   A   Yes, they have.

11   Q   And have you received expressions from witnesses in this

12   case about the potential consequences they felt of their

13   testifying and cooperating against the defendant?

14   A   Yes.  I have had several express concern about their

15   identity being released to Mr. Arencibia.

16   Q   And what is the nature of their concern?

17   A   Physical harm.

18   Q   And there are about 15 or so defendants who have been

19   prosecuted in this case to this point who have entered guilty

20   pleas?

21   A   Yes.

22   Q   Is there any other one of those 15 defendants besides Boris

23   Arencibia who has incited this concern amongst the witnesses

24   for their personal safety?

25   A   Yes.  An individual was approached by a security firm that

Lanthorn - Direct

1    had been hired by Mr. Arencibia and advised that he knew, that

2    Mr. Arencibia was looking for other witnesses that were

3    testifying against him -- this was two years ago -- that he was

4    trying to kind of flush out who the law enforcement sources

5    were, and that investigator told this former, I guess

6    coconspirator/subject/source said that he has sources that are

7    inside law enforcement that will eventually get this

8    information out to him.

9         THE COURT:  Can you do that whole thing again without

10   pronouns.

11        THE WITNESS:  It's hard to explain.

12        THE COURT:  Right.

13        THE WITNESS:  The source --

14        THE COURT:  Two years ago.

15        THE WITNESS:  Two years ago.

16        THE COURT:  A person that you're going to call what?

17   Just give that person a name so that I can follow this without

18   pronouns, please.

19        THE WITNESS:  We can call him source.

20        THE COURT:  OK.  Two years ago source was approached

21   by.

22        THE WITNESS:  Was approached by a security

23   investigator hired by Mr. Arencibia.

24        THE COURT:  Who I am now going to call Bob.

25        This is a real person?

Lanthorn - Direct

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  OK.  So Bob approached source and said?
 3              THE WITNESS:  Said we know people are testifying
 4    against Boris.  We know people are collecting evidence.
 5              THE COURT:  Who is "we?"
 6              THE WITNESS:  Him and Boris.  He was hired by Boris.
 7    So he said, I've been hired by Arencibia to go find these
 8    people, and, just so you know, Boris has contacts in law
 9    enforcement that will tell him who is testifying against him
10    and we're going to find them.
11              THE COURT:  And is source still cooperating?
12              THE WITNESS:  No.  To be clear, I don't think that is
13    why the source stopped cooperating.
14              THE COURT:  Thank you.
15              Sorry, Mr. Tamen.  Keep going.
16    BY MR. TAMEN:
17    Q    Did any of the cooperating defendants express a fear of
18    testifying against anybody except Boris Arencibia?
19    A    No.  He's the only one.
20    Q    Now, have you also spoken recently with another
21    confidential source prior to the defendant's indictment who
22    said that, made reference to the defendant knowing he was under
23    investigation?
24    A    Yes.  One of our cooperators said that Boris is aware that
25    he's under investigation, given that all his coconspirators, a
```

Lanthorn - Direct

1   large portion of them have been indicted and sentenced, and

2   that he has a plan B, which is to escape to Cuba.

3          THE COURT:  When did this occur, and -- sorry -- flesh

4   this one out again.

5          THE WITNESS:  When did that occur?

6          THE COURT:  Start with when it occurred and then be

7   more specific about how it is --

8          THE WITNESS:  September 2023.  I would ballpark it at

9   that.

10          THE COURT:  I'm sorry.  Just be real specific again

11   about how this information came to you.

12          THE WITNESS:  It came through one of our sources, his

13   ties to the surrounding group that works with Boris and with

14   his coconspirators.

15          THE COURT:  Mr. Tamen, can you be more specific?

16   BY MR. TAMEN:

17   Q   Was this a confidential source that has been cooperating

18   with the FBI?

19   A   Yes.

20   Q   And does some of his cooperation involve providing

21   information about Boris Arencibia?

22   A   Yes, it does.

23   Q   Did he say what Boris had told him about what his plans

24   were as a result of knowing that he was under investigation?

25   A   That if he was indicted he was going to flee to Cuba.

Lanthorn - Direct

1    Q    And did the source make any reference to any connections

2    that Boris Arencibia had in Cuba that would facilitate him

3    going to Cuba and reestablishing his residence there?

4    A    He alleged that Boris has ties to the Cuban government

5    through Raul Castro's grandson, called Cangrejo.

6              MR. TAMEN:  I tender this witness for

7    cross-examination.

8              THE COURT:  Are you familiar with the circumstances

9    surrounding the defendant's arrest in this case?

10             THE WITNESS:  Yes.

11             THE COURT:  Can you tell me what they were.  Where,

12   when, and what the general circumstances were.

13             THE WITNESS:  He was arrested by the SWAT team Friday,

14   I think.  I don't have the exact date on me.  I have to look at

15   my phone real quick.

16             THE COURT:  Not this past Friday?

17             THE WITNESS:  No.  It was two Fridays ago.

18             THE COURT:  All right.

19             THE WITNESS:  It was, right?

20             THE COURT:  Pursuant to an arrest warrant?

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  OK.  So when you say SWAT team, that means

23   he didn't know they were coming?

24             THE WITNESS:  He didn't know we were coming.

25             THE COURT:  OK.  Tell me what happened at the arrest.

Lanthorn - Cross

 1          THE WITNESS:  I picked him up in the driveway and

 2   drove him to the marshals.  I mean, I don't think he fought

 3   with us.  I wasn't there.  I haven't seen it.  But I came

 4   afterwards, after the SWAT team had taken him into custody, but

 5   there was no documentation of him fighting with anyone.

 6          THE COURT:  OK.  He was arrested inside of his home?

 7          THE WITNESS:  Yes.

 8          THE COURT:  And you picked him up outside and

 9   transported him?

10          THE WITNESS:  Yes.

11          THE COURT:  OK.  Sorry, Mr. Quintero.

12          MR. QUINTERO:  Thank you, your Honor.  If it pleases

13   the court.

14   CROSS-EXAMINATION

15   BY MR. QUINTERO:

16   Q    Agent Lanthorn, good morning.

17   A    Good morning.

18   Q    You and I do know each other.

19   A    It's been a long time.

20   Q    That's right.

21          I want to talk to you first as an FBI agent.  You're

22   obviously aware that once a defendant invokes his right to

23   counsel or silence you cannot question him anymore, correct?

24   A    Yes.  Yes.

25   Q    All right.  You're also aware that back in February of 2023

Lanthorn - Cross

1  I communicated with Mr. Tamen, advised that I represented

2  Mr. Arencibia, and to let you folks -- I guess I didn't know

3  who the agents were at the time, but you and your team know

4  that he was represented by counsel, correct?

5  A   Yes.

6  Q   And as such, once that information came to you, you're

7  obviously aware that you cannot question the defendant?

8  A   That's correct.

9  Q   All right.  At the time of his arrest, did someone get, one

10 of your team members get him to waive his rights?

11 A   No.  I mean, they gave him an advisement waiver but not to

12 waive.

13 Q   I'm showing you what's been marked as Defendant's Exhibit 8

14 for identification.

15          Now, I understand that is not an FBI form, but it is

16 an FDA form, and you do have FDA team members --

17 A   Yes.

18 Q   -- in this squad, correct?

19 A   Yes.

20 Q   All right.  Can you explain -- is your signature on that

21 page?

22 A   At the very bottom, that I was there when they Mirandized

23 him in Spanish.

24 Q   All right.  So explain to the court, why would you

25 Mirandize Mr. Arencibia when you've known since February that

1  he's represented by counsel?

2  A   So that he's aware of his rights to actually having

3  counsel.  It's standard procedure even if they're represented.

4  Q   Did you question him?

5  A   No.

6  Q   Nobody asked him any questions?

7  A   Not that I'm aware of.

8  Q   OK.

9  A   I mean, I think he, I think he talked a little bit about

10  some of the music promotions, the artists that he represents,

11  but I don't think anybody actually questioned him about it.

12  Q   All right.  Now, just so that we're clear, I'm going to

13  show you Plaintiff's Exhibit 1.  If you could start from the

14  back and work your way to the front.

15       These are a series of emails that I sent to Mr. Tamen.

16  The first one --

17       MR. QUINTERO:  Your Honor, you start from the back and

18  work your way forward because they go from the oldest to the

19  more recent.

20  Q   -- wherein I informed Mr. Tamen that Mr. Arencibia had

21  counsel and that we offered to surrender with no preconditions

22  at any time, do you see that?

23  A   Yes.

24  Q   Then there is a followup email in April.  Not having heard

25  from Mr. Tamen or anyone from the U.S. Attorney's Office, I

Lanthorn - Cross

1    emailed again, reiterated the same offer.

2              Were you aware of that?

3    A   Yes, I'm aware that Mr. Tamen received these emails.

4    Q   All right.  Can you tell the court who made the decision

5    not to allow Mr. Arencibia to surrender?

6              MR. TAMEN:  Objection.  Relevance.

7              THE COURT:  I don't know yet.  Overruled.

8              THE WITNESS:  So answer?

9              THE COURT:  Yes.

10   A   I discussed it with Mr. Tamen and we decided it was best to

11   have him arrested.

12   Q   Now, when you went to arrest him, you are aware that your

13   group -- you said you hired a SWAT team, correct?

14   A   It's the FBI SWAT team.

15   Q   It's still a SWAT team.

16   A   Yes.

17   Q   Automatic weapons?

18   A   Yes.

19   Q   Lasers?  The whole works, right?

20   A   Yes.

21   Q   Bulletproof vests?

22   A   Even I have that.

23   Q   So what you did was you ran through the gate outside his

24   house, destroyed the gate to get into the property, correct?

25   A   I actually don't know what they did because I wasn't there.

Lanthorn - Cross

1    Q   OK.  Well, I can tell you that whoever was there --

2              MR. TAMEN:  Objection to counsel testifying, your

3    Honor.

4              THE WITNESS:  I legitimately wasn't there, your Honor.

5              THE COURT:  Mr. Quintero --

6              MR. TAMEN:  Also to relevance.

7              THE COURT:  One at a time.

8              MR. TAMEN:  Also relevance.

9              MR. QUINTERO:  I'll rephrase.

10             THE COURT:  Thank you.

11   BY MR. QUINTERO:

12   Q   You are aware that the team -- because you are the lead

13   agent, you get a report on the arrest -- that they broke the

14   gate, they broke down the gate, right?

15   A   I don't know if they broke it down.  I think they cut the

16   cable and pushed it to the side.

17   Q   All right.

18   A   Did they run it -- I haven't seen it.  Did they run it

19   over?

20   Q   There is a buzzer outside that house that you press and you

21   could have announced that you were there and so on and so

22   forth, but for whatever reason you chose not to do that,

23   correct?

24   A   They chose not to, no.

25   Q   All right.  When you got onto the property, did you break

Lanthorn - Cross

1    down the front door?

2    A   It wasn't broken down.

3    Q   OK.  In fact, you either pressed the button and asked him

4    to come out or you used the bullhorn and said that you were the

5    FBI, come out, and he came out with his hands up in his

6    underwear, correct?

7    A   Mr. Quintero, I was literally a mile away when they

8    arrested him.  I don't know how they got him out of the house.

9    I don't know any of that.

10   Q   Have you seen any reports on the arrest and how it was

11   effectuated?

12   A   The report just said he was taken into custody and handed

13   to me.  They wear body cameras.

14   Q   All right.

15   A   So they don't write lengthy reports about it.

16   Q   All right.  Now, I want to go back.  This situation that

17   you talked about with this Angel Millones --

18   A   Yes.

19   Q   -- you said that that occurred in 2011?

20   A   His arrest did.

21   Q   OK.  Do you have any evidence that Mr. Arencibia has gone

22   back and met with Mr. Millones or had any involvement with

23   Mr. Millones?

24   A   No, I don't.

25   Q   Since 2011?

Lanthorn - Cross

1  A   Yeah.

2  Q   OK.  What you do have is that he went with his wife and did

3  something for the poor community, that was basically handing

4  out gifts to the people of that community?

5  A   Yes.

6  Q   It was a charitable thing, correct?

7  A   Yes.

8  Q   All right.  Do you have any knowledge of anything

9  illegal --

10  A   No.

11  Q   -- during that incident?

12  A   No.

13  Q   Now you said that, you tied that incident with, I think you

14  said a benefit to a gang member?

15  A   It's been alleged that it's a benefit for Millones and his

16  gang, is what it was, to show support, solidarity --

17  Q   Right.

18  A   -- in his wrongful imprisonment.

19  Q   You are aware that Mr. Arencibia lived in Puerto Rico for

20  many, many years, correct?

21  A   I'll take your word for it.

22  Q   And you are aware that some of his music business, a lot of

23  his music business occurs in Puerto Rico, correct?

24  A   Yes.

25  Q   All right.  So the charitable event could have been

Lanthorn - Cross

1    completely related to his music business, his production, and

2    not have anything to do with any gang member, correct?

3    A    Could it be marketing, sure.

4    Q    Or how about just an act of charity?

5    A    It's a pretty interesting place to do it.

6    Q    He is not taking anything back.

7    A    OK.  Sure.

8    Q    OK.

9    A    It could be.  You could paint it that way.

10   Q    All right.  Let's talk about the 2018 incident that you

11   referred to in one of the reports.

12   A    The City of Miami?

13   Q    Yes.

14          Do you know what happened in that incident?

15   A    No.

16   Q    Are you aware that that whole case was dismissed?

17   A    Oh, it doesn't surprise me, but yes.

18   Q    I'm asking you, do you know that that case was dismissed

19   completely?

20   A    No.

21   Q    OK.  Now let's talk about the 2023 September incident.

22   A    Yes.

23   Q    The first report that Mr. Tamen sent me consisted of eight

24   pages.  Is that the report you have?

25   A    Yes.  I got the one from you today.

Lanthorn - Cross

1   Q   Actually, he gave it to you today.  I gave it to him last

2   night.

3   A   Yes.

4   Q   You're talking about the supplementals?

5   A   Yes.

6   Q   All right.  I want to walk the court through -- I am going

7   to use my copy.  Defendant's Exhibit 5 is the complete report.

8           Let's walk through this.  OK.  What occurred here is

9   that this individual Batista, who claims to be a victim in this

10  case -- are you aware of who he is?

11  A   I believe he is a musician, isn't he?

12  Q   A what?

13  A   Is he a reggaeton musician?

14  Q   Well, do you know who he is?

15  A   I don't know who he is personally.

16  Q   Right.  In the report it reflects that he calls himself a

17  famous social media giant or something like that, right?

18  A   Yes.

19  Q   So he has a YouTube channel, right, or some kind of channel

20  where subscribers pay and advertisers pay depending on the

21  number of subscribers, right?  That's what he's saying, or you

22  don't know that?

23  A   I don't know that, but --

24  Q   All right.  We will get into it with another witness.

25          By the way, do you know where this individual lives?

Lanthorn - Cross

1    A    No.

2    Q    Are you aware he lives in Kentucky?

3    A    No.

4    Q    Are you aware he traveled to Miami to actually pick a fight

5    with Mr. Arencibia and his artist?

6    A    No.  I know he was saying bad things, obviously.

7    Q    The detective who investigated the case and the report is

8    followed by two interviews, one of Mr. Arencibia's and one of a

9    gentleman by the name of Lenier, who is an artist, and the

10   detective concluded that he was not arresting anybody.  It is

11   on page 4 of 4 of the supplementals.

12   A    Yes.  I think it was right before he said there was no

13   video, so they couldn't get video, so it was mutual combatants.

14   Q    Well, it doesn't matter.  He says:  I was unable to locate

15   any footage of the incident or independent witnesses.  Right?

16   A    Yeah.

17   Q    And therefore it was word against word, he said/she said?

18   A    Yes.  I think it was alleged that that is Mr. Arencibia's

19   bar.

20   Q    Right.

21   A    So it was tough to find somebody to testify against him,

22   and the video didn't happen to work that night.

23   Q    Well, the report doesn't say that.  The report just says

24   that there was no video footage and there were no independent

25   witnesses and, therefore, the detective concluded that there

Lanthorn - Cross

1  was insufficient probable cause to arrest anybody.  Isn't that

2  what he's -- isn't that basically --

3  A   Oh, yeah, that's what he's saying, we don't have the

4  evidence.

5  Q   All right.  Now, you also testified about a festival in

6  Cuba and you used the date of May 2023.

7  A   I tried to ballpark it, yeah.

8  Q   There is a report, which Mr. Tamen showed me, that claims

9  that the festival occurred around August 18, 2023.

10          Are you familiar with that report?

11 A   I've seen the other one, yes.

12 Q   OK.  So I want to be clear.  Are we talking about two

13 different festivals or one festival?

14 A   I believe there were two separate ones.

15 Q   OK.

16 A   I believe there had been two down there.

17 Q   All right.

18 A   There isn't a lot of media coverage about what happens in

19 Cuba.

20 Q   I understand.  But the festival that, quote-unquote, the

21 report accuses Mr. Arencibia of attending is the one in August

22 of 2023, correct?

23 A   Correct.

24 Q   All right.  There is no report, at least that I've been

25 shown, that accuses Mr. Arencibia of being in Cuba in May of

Lanthorn - Cross

1    2023, correct?

2    A    Yeah.

3    Q    All right.  And that report comes from a confidential

4    source, correct?

5    A    Yes.

6    Q    And you were not able to verify whether or not

7    Mr. Arencibia was in Cuba at that time, correct?

8    A    That's correct.

9    Q    All right.  You just took the informant's word?

10   A    Yeah.  You have to start somewhere.

11   Q    All right.  But you never followed up to confirm whether or

12   not he was there?

13   A    Well, we couldn't prove he was there, no.

14   Q    All right.  Let's talk about the indictment.  I'm going to

15   give you a copy of the indictment.

16            MR. QUINTERO:  Judge, does the court need a copy of

17   the indictment?

18            THE COURT:  No, I've got it.  Thank you, Mr. Quintero.

19   I have it.

20            MR. QUINTERO:  Beautiful.

21   BY MR. QUINTERO:

22   Q    All right.  The first thing I want you to do, to go

23   through, let's go through the dates of the three conspiracies,

24   and, if I'm not mistaken, the last overt act in each of the

25   conspiracies is May 2019.

Lanthorn - Cross

1   A   Yeah, that would be good.

2   Q   We can agree on that?

3   A   We should -- yeah, for this.

4   Q   All right.  So we're now five years into the future after

5   May 2019, right?

6   A   Yeah.

7   Q   Can we agree that between May 2019 and today you have no

8   evidence of Mr. Arencibia being involved in the adulterated

9   pharmaceutical distribution, correct?

10  A   That I have evidence right now?

11  Q   Yes.

12  A   Well, no, I don't have it with me, no.  We're still here,

13  obviously.

14  Q   I'm talking after May of 2019.  I'm not talking during

15  the --

16  A   As far as this window of conspiracy?

17  Q   Correct.

18  A   I have nothing tying him to this window of conspiracy that

19  is going on today.

20  Q   So I spoke to Mr. Tamen regarding some of the evidence and

21  he advised me that there are no recordings of Mr. Arencibia

22  regarding anything related to this particular indictment.

23  A   Yes, that's correct.

24  Q   You agree with that?

25  A   Yes.

Lanthorn - Cross

1    Q    Would you also agree, and tell me if there is, are there

2    any text messages or emails that would in any way support any

3    of the allegations as they relate to Mr. Arencibia in the

4    indictment, and we can go through the allegations that mention

5    Mr. Arencibia.

6             For example, overt act number one:  Beginning in or

7    before January 2013, defendant Boris Arencibia controlled a

8    corporation, Quality Supplement Distributors, used for

9    distribution of diverted pharmaceuticals.

10            Do you have any text messages or emails that support

11   that allegation?

12   A    I don't have those readily available with me now.

13   Q    I didn't ask you whether --

14   A    Yeah, no.

15   Q    -- you had them here.  I'm asking you, do you have them?

16   Do you have any text messages or emails that would support

17   Boris Arencibia's involvement with that company?

18   A    As of right now, if it is there, it hasn't been tied to him

19   or we haven't found it yet.

20            THE COURT:  Wait.  Wait.

21   Q    OK.  So the answer --

22            THE COURT:  Wait.  Agent, I'm not sure you're

23   understanding the question.

24            THE WITNESS:  I know what he's saying.  It's like

25   but --

Lanthorn - Cross

1          THE COURT:  Your answer suggests that you don't.  So
2     Mr. Quintero is not asking you what is on your person.
3          THE WITNESS:  Yes.
4          THE COURT:  Mr. Quintero is asking whether you, in
5     that royal you the government kind of way, have emails or text
6     messages that support the overt acts that are alleged in this
7     indictment.
8          THE WITNESS:  No, not that I've seen.
9          THE COURT:  And you're the case agent.
10          THE WITNESS:  I'm the case agent, but we have two
11    terabytes of data we have collected in this matter, and that is
12    the equivalent of two massive college libraries.  So if and
13    when we start going to trial and we start tightening things up,
14    there could be things that appear --
15          MR. QUINTERO:  Well --
16          THE WITNESS:  -- that are more damaging for your
17    client.
18    BY MR. QUINTERO:
19    Q   And if I --
20    A   So as of right now, no.
21    Q   And if I buy the lotto ticket, I could win the lotto, but I
22    don't have a lotto ticket now.
23          My question to you is, at this point --
24    A   I have better odds.
25    Q   -- up to this point, OK --

Lanthorn - Cross

1    A    Up to this point.

2    Q    -- have you found -- up until today --

3    A    Yes.

4    Q    -- have you found any text messages or emails that would

5    support the accusation in paragraph number one?

6    A    Nothing that ties him directly from him.

7    Q    All right.  Now are you also aware that this company,

8    Quality Supplement Distributors, I'm assuming you did the job

9    that I know you do, you checked with SunBiz to find out

10   something about this company?

11   A    Well, yes.

12   Q    Yeah.  And so the company was created on November 13, 2014

13   and it was dissolved on November 25, 2015.  So this company --

14   you see the SunBiz records to refresh your recollection,

15   please.

16           So this company was opened for six months, basically?

17   A    Yes.

18   Q    Now this company is registered to an individual by the name

19   of Manuel Rodriguez, correct?

20   A    Correct.

21   Q    And is Manuel Rodriguez somebody that you interviewed?

22   A    No.

23   Q    Do you know where Manuel Rodriguez is today?

24   A    No.

25   Q    So I'm assuming if you didn't interview Manuel Rodriguez,

Lanthorn - Cross

1  this allegation comes from some cooperating individual who told

2  you, oh, by the way, Mr. Arencibia has a connection to this

3  company, right?

4  A   Yes, coconspirators.

5  Q   All right.  Let's go to allegation paragraph number 6.

6          MR. TAMEN:  Judge, I am going to have to object.  This

7  is not a discovery deposition for use in trial.  This is a

8  pretrial detention hearing.  The witness has already said in

9  general that he doesn't have at this time recordings or emails

10 or text messages relating to the specific overt acts.  I think

11 that is sufficient.

12         MR. QUINTERO:  I only asked about overt act number

13 one.  If he's telling me he's got no text messages or no emails

14 regarding any of these acts, but I want to show the court which

15 acts we're talking about just to be sure, I'm done.  I mean, I

16 don't need to get into this area any more.  I was only asking

17 about overt act number one.

18         THE COURT:  Right.  I understand Mr. Tamen's point.

19 Is the answer going to be the same with respect to all the

20 overt acts --

21         MR. QUINTERO:  Yes.

22         THE COURT:  -- either text messages or emails?

23         MR. TAMEN:  Yes, they will be the same.

24         MR. QUINTERO:  OK.

25 BY MR. QUINTERO:

Lanthorn - Cross

1  Q   Now, were you aware that -- by the way, did you ever

2  interview this gentleman, Mr. Batista, regarding the incident

3  of --

4  A   No.  No.

5  Q   Did you ever interview any of the people related to the

6  incident of September of 2023?

7  A   No.

8  Q   Did you ever interview any of the people related to the

9  2018 incident?

10  A   No.

11        MR. QUINTERO:  If I may have a moment, your Honor.

12        THE COURT:  Of course.

13        (Pause)

14  BY MR. QUINTERO:

15  Q   Lastly, the last area you talked about was potential

16  consequences, physical harm to a witness.  I think you

17  testified about one witness.

18  A   Several witnesses have said it.

19  Q   All right.  But you've said that that information is two

20  years old.

21  A   Well, no, it happened recently.  After his arrest I got

22  calls from two of them.

23  Q   OK.  So after his arrest you got a call from somebody that

24  said that they were afraid?

25  A   Yes.

Lanthorn - Cross

1    Q   OK.  Is that the other report that Mr. Tamen showed me?

2    A   No.  I actually don't know which ones he's shown you.

3    Q   I am going to show it to you.  I think we're talking about

4    the same thing --

5    A   OK.

6    Q   -- but I want to be clear.

7              Mr. Tamen showed me this report, and I want to --

8              A VOICE:  You need to be on the microphone, counsel.

9    Q   I believe it is the second report.  I think it's this one.

10   A   Yes, this one.  I didn't know that you had seen this one.

11   Yes.

12   Q   OK.

13   A   This one --

14   Q   This is the same incident, right?

15   A   That's another one, yeah.

16   Q   And just so we're clear, OK, this individual did not say

17   that he was threatened.  He said that he feared, OK, he was

18   afraid, even though there's been no incident and no event that

19   would cause him to be, quote-unquote, in fear; isn't that what

20   he said?

21   A   Yeah, because it was that night.  It was the 26th.  Boris

22   was arrested on the 26th at 6 a.m.  I got that call that night,

23   at 6 p.m.

24   Q   OK.  I'm not saying you didn't get the call.

25   A   Yeah.

Lanthorn - Cross

1    Q    My question is, does the report not reflect that there was

2    absolutely no basis or no incident that would cause this

3    individual to be, quote, in fear of Mr. Arencibia?  He said he

4    was, but there was nothing, he hadn't been threatened, he

5    hadn't been called, nobody had talked to him, nothing along

6    those lines?

7    A    Yeah, nothing had happened yet.

8    Q    Huh?

9    A    Nothing had happened yet, but he didn't know that Boris was

10   going to be arrested.

11   Q    OK.

12   A    Mr. Arencibia was going to be arrested.

13   Q    All right.  Just so we're clear, you got a phone call.  An

14   individual says I'm afraid of this guy, but he has nothing to

15   say that would show that he was recently in any way contacted

16   or in any way intimidated or threatened, correct?

17   A    No.

18   Q    No, that's not --

19          THE COURT:  I'm lost.  Sorry.  I'm lost.  Is this the

20   same report that happened two years ago?

21          THE WITNESS:  No, this was the day of.  This is

22   another person.

23          THE COURT:  This is the day of his arrest.  This is a

24   different report from a different cooperator who called you to

25   say I have fear now that he's arrested?  I'm sorry, guys, but

Lanthorn - Cross

 1   I'm lost.

 2            THE WITNESS:  Yes.

 3            MR. QUINTERO:  You hit it right on the head, Judge.

 4            THE WITNESS:  Yes.

 5            MR. QUINTERO:  That's exactly what occurred.

 6            THE WITNESS:  Yes.  That's another cooperator called

 7   and said -- did not know that Boris was being arrested and

 8   said, essentially, what's my exposure and I've been hearing

 9   that I'm a target now because it hit the media a lot faster

10   than we thought it would.

11   BY MR. QUINTERO:

12   Q   But once again, he provided absolutely no evidence to back

13   that up?

14   A   Yes, that's correct.

15   Q   All right.  And you didn't do anything to confirm that, did

16   you?

17   A   Well, I --

18   Q   Because there is nothing to confirm?

19   A   Do you know how hard it is to be --

20   Q   Because there's nothing to confirm, right?

21   A   He's advised.  He has a lawyer.  I can't go ask him if he

22   threatened anybody.

23   Q   Right.  OK.

24            The last thing you said that there was a plan B and

25   that, I believe, the other report, which you have in front of

Lanthorn - Cross

1   you, talks about Boris going to Cuba for the festival and

2   talking to the people from the Castro government?

3   A   I think you took that one back.

4   Q   I did?

5   A   Yes.

6       Yes, this one.

7   Q   This is going back to my other question about when the

8   festival occurred.

9   A   Yes.

10  Q   I believe that that report reflects that the festival

11  occurred in 2018 -- August 18, 2023?

12  A   Yes.  It looks like this was the date the source thought

13  this festival occurred.

14  Q   And once again this is another informant that came in and

15  told you this stuff, OK, and of course, you could not verify

16  that Mr. Arencibia was in Cuba --

17  A   Yeah.

18  Q   -- correct?

19      But we do know that the festival occurred around

20  August 18th, around that time frame, 2023, correct?

21  A   Yes.  I think there was a festival at that time by this

22  similar name.

23  Q   All right.  Now, you've been investigating Mr. Arencibia

24  for how long?

25  A   Since 2013.

Lanthorn - Cross

1  Q   Can you explain to the court why it took you five years,

2  from the date of the last overt act, to arrest and charge

3  Mr. Arencibia?

4         MR. TAMEN:  Objection, your Honor.  It goes into a lot

5  of information regarding the deliberative process of law

6  enforcement.  It would involve work product privilege of

7  discussions with agents in the U.S. Attorney's Office and

8  information that really has nothing to do with the pretrial

9  detention hearing.  We have to deal with the status of the

10  defendant and the evidence today, not what it was in 2013.

11         THE COURT:  I don't want you to go into anything that

12  would be work product, meaning any advice that you received

13  from the attorneys in this case.  If there is a fact that was

14  germane to your decision -- I know that you've already

15  testified that you built the case from cooperating witnesses,

16  for example.  So this has already been explored on direct

17  examination by Mr. Tamen.  So I don't want you to reveal to me

18  any advice you received from the attorneys or any strategy, but

19  if there is a fact responsive to that question, you can answer

20  it.

21         Do you understand?

22         THE WITNESS:  Yes.

23         Honestly, I would say COVID is one of the big reasons

24  this has taken so long.  That shut everything down for roughly

25  two-and-a-half years.

Lanthorn - Cross

1    BY MR. QUINTERO:

2    Q    All right.

3    A    This should have been done shortly after those search

4    warrants and after other cooperators that agreed and testified.

5    Q    Well, let's talk about that.

6    A    COVID?

7    Q    No, the cooperating defendants.

8          Let me show you Defendant's Exhibit 9.  This is my

9    summary of the defendants in this case, the bonds that they

10   got, and when they pled guilty, and I want to walk you through

11   this.

12         MR. TAMEN:  Judge, can we have a proffer of what the

13   relevance of this is going to be?  There is an entire page of

14   codefendants here.

15         THE COURT:  Well, I have a different question.  Is

16   there going to be any contest to any of this information, which

17   I assume all came off of the docket.

18         MR. QUINTERO:  All of it came off the docket, your

19   Honor.

20         THE WITNESS:  Not by me.

21         THE COURT:  I understood that because Mr. Quintero

22   told me he made it.  I was asking Mr. Tamen if there is going

23   to be any contest to Defendant's Exhibit 9's information

24   regarding the status of other defendants, because if not, then

25   the document kind of speaks for itself and we don't need the

Lanthorn - Cross

 1    agent to go through it.

 2            MR. QUINTERO:  Correct.  Correct.

 3            THE COURT:  OK.

 4            MR. TAMEN:  There's only one issue.

 5            May I see that, please?

 6            (Pause)

 7            MR. TAMEN:  There is one item that is not included on

 8    that report.  At the bottom of page 1, Lazaro Roberto

 9    Hernandez, this does not reflect that his bond was revoked for

10    violation of bond conditions and he was incarcerated --

11            MR. QUINTERO:  OK.

12            MR. TAMEN:  -- from that point on.

13            THE COURT:  So agreed?

14            MR. QUINTERO:  That is correct, but let me explain

15    why.

16            THE COURT:  OK.  Well, do I need to know why?  Because

17    I think that your proffer is just this is what happened with

18    other defendants.

19            MR. QUINTERO:  This is only this case.  His bond was

20    revoked in another case, OK, in the '21 case, I believe, which

21    is before Judge Singhal.  This case is before Judge Gayles.  So

22    I only concentrated on this case.  OK.

23    BY MR. QUINTERO:

24    Q   So you have a series of people that pled guilty, I'm

25    assuming.  You don't have to tell me they all cooperated or

Lanthorn - Cross

1   who's cooperating and so on and so forth, but we can go back

2   and we can deduce from the dates of the pleas that the majority

3   of these people pled in 2020, 2021, and there are only two

4   people that pled in 2023.  Mr. Hernandez, who pled on 2/27/23

5   and Mr. Eladio Vega that pled in 2023?

6   A   Yeah.  These are two separate indictments under the same

7   case.

8   Q   I understand.

9   A   So you're seeing two windows.  So Lazaro Hernandez can't

10  plead in 2020 because he hasn't been charged.  So he got

11  charged much later.

12  Q   He was charged in this case much later, I believe in 2020

13  or 2021, he was added as a defendant in this case?

14  A   I believe it was 2021.

15  Q   All right.  And then he had another case.  The government

16  charged him again in another case?

17  A   That's correct.

18          THE COURT:  Mr. Quintero --

19          MR. TAMEN:  Object to the relevance of this, your

20  Honor.

21  BY MR. QUINTERO:

22  Q   Which is the case before Judge Singhal?

23          THE COURT:  Mr. Quintero, tell me where we're going

24  with all of the testimony about the other defendants, please,

25  so that I can contextualize this testimony.

Lanthorn - Cross

1          MR. QUINTERO:  My point was that the government had

2     all this, all these people talking in 2020, going to the

3     question of why did it take so long to charge Mr. Arencibia.

4          THE COURT:  Do you want me to take notice of the fact

5     that they have known about this gentleman and left him at large

6     for many years?

7          MR. QUINTERO:  Of course.

8          THE COURT:  OK.  If there is a reason, Mr. Tamen, that

9     you want to elicit through your agent on rebuttal to reduce the

10    argumentative value of that evidence, I will ask you to elicit

11    it, but I understand exactly the point you're making,

12    Mr. Quintero.  Noted.

13         MR. QUINTERO:  Thank you, Judge.

14    BY MR. QUINTERO:

15    Q    All right.  So you've been investigating Mr. Arencibia

16    since 2013.

17    A    Not just Mr. Arencibia, no.

18    Q    Well, I asked you about Mr. Arencibia.

19    A    His name is in there, yeah.

20         THE COURT:  OK.  It gets so much quicker if you answer

21    the question that is asked.  OK.

22         THE WITNESS:  Sure.

23    A    His name was mentioned in 2013, yes.

24    Q    You testified earlier -- actually, you rolled your head

25    back and you said 2013.

1    A    Yeah.

2    Q    So I'm assuming that that answer related to my question as

3    to when you started investigating Mr. Arencibia?

4    A    That is correct.

5    Q    All right.

6          MR. QUINTERO:  Your Honor, thank you.  I have nothing

7    else of this witness.

8          THE COURT:  Mr. Tamen.

9    REDIRECT EXAMINATION

10   BY MR. TAMEN:

11   Q    Agent Lanthorn, there is a long list of witnesses, of

12   defendants here.  Were they all indicted at one time or were

13   there a series of indictments -- we are up to the fifth one

14   now -- in each of which additional defendants were added as a

15   result of ongoing investigation?

16   A    That's correct.

17   Q    Now, most of the defendants who were indicted initially and

18   then soon thereafter, did they have their names on bank

19   accounts, corporations, or get caught in possession of diverted

20   pharmaceuticals?

21   A    They did.

22   Q    OK.  Did Mr. Arencibia make the mistake of putting his name

23   on bank accounts or corporations that were used for criminal

24   activities?

25          MR. QUINTERO:  Object to the form of the question,

Lanthorn - Redirect

1    your Honor.  Made a mistake?  That is argumentative.

2              THE COURT:  It is.

3              Do you want to rephrase the question?

4              MR. TAMEN:  All right.  I will rephrase it.

5    BY MR. TAMEN:

6    Q    Did Mr. Arencibia leave a track record of having his name

7    on corporations or bank accounts that were used in these

8    criminal activities?

9    A    No, he did not.

10   Q    Did it take a while to develop evidence from various leads

11   in order to build a case against him?

12   A    Yes, it did.

13   Q    OK.  And were some of the cooperators interviewed multiple

14   times to nail down the details of their information?

15   A    Yes, they were.

16   Q    OK.  Did this information about the case in its entirety

17   have to be presented in its entirety to subsequent grand juries

18   because the one that heard the first indictment had expired by

19   the time of subsequent indictments?

20   A    Yes.

21   Q    And did some of the cooperating codefendants also appear

22   and testify before the grand jury?

23   A    They did.

24   Q    Were there any delays in the prosecution of Mr. Arencibia

25   that were not accounted for by the need to gather evidence and

Lanthorn – Redirect

1   put a strong case together?

2   A    No.

3             MR. TAMEN:  No further questions.

4             THE COURT:  That is why it makes it hard to rule on

5   that objection because I had a feeling that was all going to

6   come right out.

7             You can step down.

8             (Witness excused)

9             THE COURT:  Any other witnesses, Mr. Tamen?  I think

10  you said two.

11            MR. TAMEN:  That was it.  No further witnesses or

12  evidence.

13            THE COURT:  All right.  So, Mr. Quintero, I heard you

14  say that you were calling witnesses, is that right?  Three.

15  OK.

16            Alisha, do you need a break?

17            THE DEPUTY CLERK:  Yes, please.

18            THE COURT:  We need a ten-minute break.

19            MR. QUINTERO:  That's fine.

20            THE COURT:  How long do you expect on your directs?

21            MR. QUINTERO:  I think they are going to be very, very

22  quick.  They are actually witnesses that will dispel the

23  statement that --

24            THE COURT:  Before we go there, I just am trying to

25  plan because at some point I have to give the marshals a break.

Lanthorn - Redirect

1    So if I need to take a lunch break and resume your detention

2    hearing at the other side, that is why I'm trying to figure out

3    how many minutes you think you need on direct examination.  I

4    know you don't control cross.

5           If you are going to take more than a half hour, then I

6    am going to let them break by noon.

7           MR. QUINTERO:  I think I will be a little bit more

8    than a half hour.  Not much more.  But I have a feeling each

9    witness will be about ten minutes or less.

10          THE COURT:  OK.  Let me look at my marshals.

11          MR. QUINTERO:  Maybe a little bit more depending on --

12          THE COURT:  Do you want me to finish it out or do you

13   want me to break?  Finish it out?  OK.

14          Then let Alisha have a ten-minute comfort break and we

15   will resume and be mindful that at some point -- I am not going

16   to cut you off -- but I may have to give court staff a lunch

17   break and resume on the other side.

18          MR. QUINTERO:  I am going to be as quick as I possibly

19   can, your Honor.

20          THE COURT:  OK.  Ten minutes.

21          THE DEPUTY CLERK:  All rise.

22          (Recess)

23          THE COURT:  Mr. Quintero, are you ready?

24          MR. QUINTERO:  Yes, your Honor, we're ready.

25          THE COURT:  Go ahead.  You can call your witness.

Perez – Direct

1           MR. QUINTERO:  Thank you.  Defense calls Robert Perez.

2           THE COURT:  I did not have that on my bingo card this

3    morning.

4           THE WITNESS:  I'm not used to -- I'm glad I found a

5    way into the witness chair.  I'm not used to it.

6           THE DEPUTY CLERK:  Mr. Perez --

7           MR. QUINTERO:  Mr. Perez, would you please state your

8    name and spell your last name for the record.

9           A VOICE:  He has to be sworn in first.

10          THE DEPUTY CLERK:  Mr. Perez, do you solemnly swear or

11   affirm that the testimony you are about to give will be the

12   truth, the whole truth, and nothing but the truth so help you

13   God?

14          THE WITNESS:  Yes.

15          THE DEPUTY CLERK:  Thank you.  Please be seated.

16          Speak into the microphone.  Spell your name.  Can you

17   spell your last name for the record.

18          THE WITNESS:  Good morning, your Honor.  Robert Perez,

19   P-E-R-E-Z.

20   DIRECT EXAMINATION

21   BY MR. QUINTERO:

22   Q   I know the court knows you, Mr. Perez, but just for the

23   record, what do you do for a living?

24   A   I'm an attorney.

25   Q   All right.  How long have you been a lawyer?

Perez – Direct

1   A    Over 20 years.

2   Q    Are you familiar with Mr. Arencibia?

3   A    Yes, I am.

4   Q    And could you tell the court how you're familiar with

5   Mr. Arencibia?

6   A    I have known Mr. Arencibia for over ten years now, probably

7   closer to 15 years.  It's evolved into a friendship, but I've

8   also represented him and I've represented associates of his.

9   Q    And you've also represented artists that he manages,

10   correct?

11   A    That is correct.

12   Q    And one of those artists is an individual by the name of

13   Lenier, L-E-N-I-E-R, correct?

14   A    That is correct.

15   Q    That's his stage name.  It also happens to be his middle

16   name?

17   A    Correct.

18   Q    All right.  So I showed the court and the government

19   Defendant's Exhibit 5 for identification.  I'm going to show it

20   to you.  It is a report regarding the incident that occurred in

21   September of 2023?

22   A    I'm familiar with it.

23   Q    And apparently there was a fight at a restaurant or a bar

24   and this individual, one of the complaining victims was an

25   individual by the name of Batista?

Perez – Direct

1    A    That is correct.

2    Q    And in the course of your investigation, what did you find

3    out about Mr. Batista?

4    A    Mr. Batista is what is called a social influencer, and he

5    had been very vocal on social media about Mr. Arencibia's

6    participation in the Santa Maria Music Festival in Cuba.

7    Q    All right.  Now, to the best of your knowledge, was

8    Mr. Arencibia at that festival in August of 2023?

9    A    No, he was not.

10   Q    All right.  And aside from that, do you know where

11   Mr. Batista originates from?

12   A    Originally he's from Cuba, but at the time that the

13   incident occurred in September of 2023 and proceedings, he

14   resided in Kentucky.

15   Q    So it appears that he traveled from Kentucky to Miami when

16   this incident occurred, correct?

17   A    That is correct.

18   Q    Now, after the incident occurred, did you speak with the

19   detective investigating the case?

20   A    Yes, I did.

21   Q    And did you set up a meeting with the detective so that

22   Lenier, your client, and Mr. Arencibia, my client, could go in

23   and give a statement?

24   A    Yes, I did.

25   Q    And were they forced to go to the police department and

Perez – Direct

1    give a statement about this incident?

2    A    No, they were not.

3    Q    All right.  They did so voluntarily, correct?

4    A    That is correct.

5    Q    And you went to the station.  I was at the station.  Both

6    Mr. Arencibia and Lenier were interviewed separately by the

7    detectives, correct?

8    A    Yes.

9    Q    Their statements were recorded, correct?

10   A    Yes.

11   Q    And in the report the detective concludes that nobody's

12   getting arrested, that if anybody wants to file charges to go

13   to the State Attorney's Office, correct?

14   A    Yes.

15   Q    All right.  So nobody got arrested in that case?

16   A    No one was arrested.

17   Q    All right.  Now, the government introduced a second

18   incident that occurred in 2018, City of Miami.

19           MR. QUINTERO:  Does the court have that report?

20           THE COURT:  I don't think so.  What exhibit number?  I

21   don't think so.

22           MR. TAMEN:  It's not a government exhibit.

23           MR. QUINTERO:  What's that?

24           MR. TAMEN:  It's not a government exhibit.

25           MR. QUINTERO:  I thought you introduced both reports.

Perez - Direct

```
 1              MR. TAMEN:  No.

 2              MR. QUINTERO:  You only introduced one?

 3              MR. TAMEN:  I didn't introduce either of them.

 4              MR. QUINTERO:  All right.  I'm going to mark this

 5    then.  I'll introduce it.

 6    BY MR. QUINTERO:

 7    Q   Let me show you Defendant's Exhibit 10 for identification

 8    and ask you if you recognize that exhibit, that report.

 9    A   Yes, I am familiar with this report.

10    Q   Tell the court how you recognize that report.

11    A   I was involved in the case.  I represented Mr. Arencibia

12    against the accusations contained in it.

13    Q   And that was an incident that occurred in 2018, correct?

14    A   Yes.

15    Q   And that incident actually occurred in a bar that

16    Mr. Arencibia owned at that time, correct?

17    A   That is correct.

18    Q   Where patrons came into the bar and basically started a

19    fight with Mr. Arencibia and some of the employees of the bar,

20    correct?

21    A   Yes.  These patrons not only started a fight but they

22    were -- they had been known to do that at other establishments

23    in order to try to file a lawsuit and so forth against --

24    Q   Yeah.  Speaking of that -- OK.  Let's finish with this

25    report.
```

Perez - Direct

1   A   Sure.

2   Q   So tell the court what happened with that case.

3   A   That case was dismissed.  Originally Mr. Arencibia was

4   arrested and then the State Attorney's Office bound down the

5   case to a misdemeanor and then nolle pros'd the case.

6   Q   All right.  In that case, your representation of

7   Mr. Arencibia, Mr. Arencibia ever refuse to go to court?

8   A   No.  In fact, I had communication with the officers that

9   were investigating the case and he made himself available

10  and -- but they didn't -- if I recall correctly, they didn't

11  even take a statement.  They just made the arrest.

12  Q   Now, as you said, you represented Mr. Arencibia for a long

13  time.  You've represented some of his business associates.

14  You've represented some of his artists.  Can you describe for

15  the court the world of the hiphop, the Latin hiphop culture and

16  what happens when these artists go out into the public.

17          THE COURT:  Can we ask a more narrow and specific

18  question.

19          MR. QUINTERO:  I'm sorry?

20          THE COURT:  Can we ask a more specific question.

21  That's pretty broad and I don't know what context to give it.

22          MR. QUINTERO:  I'll rephrase.  I'll rephrase.  I'll

23  rephrase.

24          THE COURT:  Thank you.

25  BY MR. QUINTERO:

Perez - Direct

1    Q    During your representation of the artist and/or

2    Mr. Arencibia, have you had incidences where people from the

3    public have in effect created an altercation or a fight in

4    order to gain fame and fortune from either Mr. Arencibia or

5    some of the artists that you've represented?

6    A    There is no better example than the September incident,

7    where the person, who is called Ultra Track -- that is his

8    social influencer name, but his real name, I believe, is Jorge

9    Batista -- used that incident for weeks, if not months, to get

10   clicks or views of his rants over the -- and threats that he

11   made, that he was going to sue Mr. Arencibia and tried to get

12   as much publicity as he could out of it.

13   Q    And for the record, how do those social influencers make

14   money with these podcasts or these videos?

15   A    Attracting views and followers so they could turn around

16   and sell it to marketers -- to advertisers, and so forth.

17   Q    So the more subscribers you have, the greater your chances

18   of not only receiving income from the subscribers who have to

19   pay for your program or getting advertisers to basically

20   advertise on your shows?

21   A    That is correct.

22        MR. QUINTERO:  I don't have anything else, your Honor.

23   Tender the witness.

24        THE COURT:  Mr. Tamen, do you want me to ask my

25   questions first?

Perez - Direct

1          MR. TAMEN:  OK.

2          THE COURT:  How do you know he wasn't in Cuba for the

3     festival?  You said he wasn't.  How do you know that?

4          THE WITNESS:  Well, I remember clearly that during the

5     time, the fact that Mr. Arencibia was involved in organizing or

6     in some way putting together the festival that that attracted a

7     lot of criticism.  So Mr. Arencibia responded by a video that

8     he made that appeared both on his Instagram page and in YouTube

9     where he was in his backyard.  I have been to his house many,

10    many times and I recognize his backyard, and I remember

11    specifically him responding to the criticisms that he was

12    receiving by making a video, and he was in his backyard during

13    the festival.

14         THE COURT:  It was posted during the festival?

15         THE WITNESS:  Yes, it was, or shortly thereafter.  But

16    it was made, and, again, I have been to his residence many

17    times and I recognize his backyard.

18         MR. QUINTERO:  Judge, if I may.

19         THE COURT:  Go ahead.

20    BY MR. QUINTERO:

21    Q    I asked you to look up the YouTube video a little while

22    ago, correct?

23    A    You recalled my recollection of it, but I also -- I mean,

24    like I said, I've known Mr. Arencibia and I know the issues

25    that have revolved around his life and I remember the criticism

Perez – Cross

1    that he was getting for this.

2    Q    And according to YouTube, when was that video posted?

3    A    August 20th.

4    Q    That would have been a Sunday.  That would have been the

5    day after the festival, correct?

6    A    I believe that's the last day of the festival.

7    Q    So the festival was still ongoing on August 20th?

8    A    That's correct.  The festival was August 17th to August

9    20th.

10         MR. QUINTERO:  No further questions, your Honor, and

11   thank you for giving me the opportunity to clarify that.

12         THE COURT:  Go ahead, Mr. Tamen.

13   CROSS-EXAMINATION

14   BY MR. TAMEN:

15   Q    Good afternoon, Mr. Perez.

16   A    Good afternoon.

17   Q    You were not present at either of those two barroom brawls

18   involving the defendant, the one in 2018 and the one in '23,

19   correct?

20   A    No, I was not.

21   Q    So you're just basing your opinion on what happened on what

22   people have told you?

23   A    I had an opportunity to question witnesses and do my own

24   investigation.  So I have a pretty good idea of what happened

25   those days.

Perez – Cross

1   Q   There were video cameras in the bar, in Mr. Arencibia's bar

2   at the time, correct?

3   A   It's not his bar.

4   Q   Neither one is his bar?

5   A   The one in 2018 was.

6   Q   Yes.

7   A   But not the one in 2023.

8   Q   There were video cameras in the bar in the 2018?

9   A   Yes.

10  Q   But there were no videos made of this incident, this

11  barroom brawl, correct?

12  A   I had an opportunity to review the cameras the night after

13  the incident and I saw nothing was recorded.

14  Q   Now as far as the festival in Cuba in 2023, August 2023,

15  was that the Santa Maria festival?

16  A   That is correct.

17  Q   The defendant, in fact, promoted that concert, correct?

18  A   I'm not aware of the efforts that he promoted, but I know

19  that he was involved in it.

20  Q   OK.  Now can just anybody promote a concert in Cuba or does

21  it require government permission?

22  A   I'm not aware.  I mean, I don't have that information.  I

23  don't know.  I would assume so, but I don't know.

24  Q   And in fact, the defendant was here on the Sunday, the last

25  day of the concert.  That does not preclude him having gone

Perez – Cross

1   there in order to organize things and set things up before the

2   concert, correct?

3   A   That's correct.

4   Q   So you have no knowledge as to whether or not he went there

5   to promote the festival, stayed for the first day and then came

6   back and did his video in his backyard on the last day of the

7   festival, is that correct?

8   A   I don't have specific knowledge that he was not in Cuba,

9   but, again, I know that he was, on August 20th he was sitting

10   in his backyard responding to the criticisms that he was

11   receiving.

12              MR. TAMEN:  No further questions.

13              MR. QUINTERO:  No questions, your Honor.

14              THE COURT:  Thank you, Mr. Perez.

15              THE WITNESS:  Thank you, your Honor.

16              (Witness excused)

17              MR. QUINTERO:  The defense calls Roberto Somoza.

18              Thank you, sir.

19              THE DEPUTY CLERK:  Please raise your right hand.

20              Do you solemnly swear or affirm that the testimony you

21   are about to give will be the truth, the whole truth, and

22   nothing but the truth so help you God?

23              THE WITNESS:  I do.

24              THE DEPUTY CLERK:  Thank you.  Please be seated.

25              Speak into the microphone.  State your name.  Can you

Somoza – Direct

```
 1    spell your last name for the record.
 2              THE WITNESS:  My name is Roberto Somoza, S-O-M-O-Z-A.
 3    DIRECT EXAMINATION
 4    BY MR. QUINTERO:
 5    Q   Mr. Somoza, what do you do for a living?
 6    A   I work for Mr. Arencibia.
 7    Q   In what capacity?
 8    A   In his musical endeavors and recording studio.
 9    Q   Now Mr. Arencibia, just so the court is aware, has a
10    company that manages boxers, correct?
11    A   Correct.
12    Q   And he has a company that manages artists, correct?
13    A   And a music label as well.
14    Q   And he has a company that publishes for the artist or
15    produces the songs for the artist, correct?
16    A   Correct.
17    Q   Right.  You've been sitting in court and you've heard the
18    testimony that the government has evidence or the government
19    has a report that says that Mr. Arencibia was in Cuba on or
20    about August 18th or August 19th during the Cuban music
21    festival.  Have you heard that?
22    A   Yes.
23    Q   And do you have any knowledge --
24              MR. TAMEN:  Object, your Honor.  I'm going to object.
25    That misstates the evidence.  Nobody from the government
```

Somoza - Direct

```
 1    testified that he was there.

 2              THE COURT:  OK.

 3              MR. TAMEN:  He was there in 2015.  We did not have

 4    anybody testify that he was present in Cuba in August of 2023.

 5              THE COURT:  I think your case agent testified that a

 6    cooperator told him that he was there.

 7              MR. TAMEN:  I don't believe it is testimony.  May I

 8    check with the agent?

 9              (Pause)

10              MR. TAMEN:  I believe the testimony was that he

11    promoted it, not that he was personally physically present.

12              THE COURT:  So I should strike from my notes

13    allegations that he was in Cuba for the music festival based on

14    cooperator's testimony but law enforcement was not able to

15    corroborate?  I should strike that?  That didn't happen.

16              MR. TAMEN:  We don't have any evidence of that.

17              THE COURT:  OK.  Moving right along.

18    BY MR. QUINTERO:

19    Q   I am going to make this very short.  Do you have any

20    personal knowledge as to whether or not Mr. Arencibia was at

21    the Cuban music festival in August 18th or 19th or 20th of

22    2023?

23    A   He was -- we worked whatever needs to be done for the

24    festival in Miami.

25    Q   All right.  So you were with him during that period of time
```

Somoza – Direct

 1  working in Miami?

 2  A   That's correct.

 3  Q   Tell the court what you were doing in Miami in regards to

 4  anything related to the festival?

 5  A   Anything regarding to the festival, anything -- any digital

 6  promotion that needed to be done, any logistical questions or

 7  things that needed to be done, we were doing it from here.

 8  Q   All right.  And the reason for that is because

 9  Mr. Arencibia had artists --

10          MR. TAMEN:  Objection.  Leading.

11          THE COURT:  I need to hear the whole question.

12          Mr. Quintero, do you want to ask the question, please.

13          MR. QUINTERO:  Yes, ma'am.

14          THE COURT:  Then wait for the question to conclude

15  before you object.

16          MR. QUINTERO:  Yes, ma'am.

17  BY MR. QUINTERO:

18  Q   And the reason for that is because Mr. Arencibia had

19  artists that he managed that were there performing at the

20  festival and there were certain recordings being conducted of

21  those artists as they were performing, correct?

22          THE COURT:  Hold up.

23  A   That's correct.

24          THE COURT:  Leading.

25          MR. QUINTERO:  I'm sorry.  My apologies, your Honor.

1    I took the liberty because I was trying to get through this as

2    quickly as possible.  My apologies.

3    BY MR. QUINTERO:

4    Q   And would you tell the court what it is that you were doing

5    with Mr. Arencibia during those days of the festival in Miami.

6    A   We were coordinating everything to make sure everything

7    went on smoothly and the performances would go on smoothly.

8    Q   And tell the court how long you've been working for

9    Mr. Arencibia.

10   A   Around six, seven years.

11   Q   All right.  And at all times that you've worked with

12   Mr. Arencibia has been in the production of either musicians or

13   management of boxers or things that relate to his businesses?

14   A   Yes.  All the musical endeavors.

15   Q   Has Mr. Arencibia ever asked to you do anything illegal?

16   A   No.

17           MR. QUINTERO:  Nothing further, your Honor.

18           MR. TAMEN:  No questions.

19           THE COURT:  Thank you.  You can step down.

20           (Witness excused)

21           MR. QUINTERO:  I can call off my last witness, but I'd

22   like to offer --

23           THE COURT:  Go ahead, but use a microphone so if you

24   ever need a transcript, you have it.

25           MR. QUINTERO:  Yes.  Unless Mr. -- one moment, your

1   Honor.  I lost my pad here.  Oh.

2          In the courtroom today, your Honor, is an individual

3   by the name of Yunior, Y-U-N-I-O-R, Dortico, D-O-R-T-I-C-O.

4   Mr. Dortico is a world champion boxer.  He is one of

5   Mr. Arencibia's boxers.  He is ranked in the top ten in the

6   world, who was at the music festival with Mr. Arencibia's wife

7   and his children and would testify that during the whole time

8   that he was at the festival Mr. Arencibia was not there, number

9   one, and, number two, he spent the entire weekend of the

10  festival speaking with Mr. Arencibia over the phone and got an

11  almost $2,000 phone bill for all the times that he was calling

12  Mr. Arencibia, who was in Miami at the time.

13         So if Mr. Tamen wants me to call him as a witness, I'm

14  happy to do it.

15         MR. TAMEN:  No.  I will accept the proffer.

16         THE COURT:  OK.  Thank you.

17         MR. QUINTERO:  I am done with all the witnesses, your

18  Honor.  If your Honor wants argument, we're prepared to do

19  that.

20         THE COURT:  OK.

21         MR. QUINTERO:  Oh, I do have -- I'm sorry -- I do have

22  a couple of other exhibits that I want to proffer, your Honor.

23         Back in May -- sorry, in March -- this is after I sent

24  Mr. Tamen my first email -- I suspected, with the last of

25  response, that we would be here today arguing risk of flight

1   and/or danger to the community.  So I asked Mr. Arencibia if he

2   would give me his passport.

3           I have, if I may, Defendant's Exhibit --

4           THE COURT:  Mr. Quintero, just hand it up to me and

5   leave Alisha alone.

6           MR. QUINTERO:  I'm sorry?

7           THE COURT:  Just come to me when you have exhibits and

8   leave her alone, please.  You're torturing her.

9           MR. QUINTERO:  Judge, if you take a look at that, that

10  is the cover sheet or a copy of the envelope that --

11          THE COURT:  You gave a copy to Mr. Tamen?

12          MR. QUINTERO:  I gave him a copy, your Honor.

13          THE COURT:  OK.

14          MR. QUINTERO:  So Mr. Arencibia, who has always

15  responded to my requests to come to the office since I started

16  representing him -- I actually started representing him in

17  December of 2022.  I didn't send the email until February of

18  202 -- I'm sorry.  Yes, 2023, because I needed to get my feet

19  wet on this case.  I needed to acquire documents, look at the

20  documents, things of that nature before I reached out to

21  Mr. Tamen.  But if you look inside, if I show you the envelope,

22  I have Mr. Arencibia's Cuban passport.

23          Now, as your Honor knows, we have an obligation to be

24  candid with the court.  I held onto this passport until -- is

25  that 3?

```
 1              MR. TAMEN:  Yes.

 2              MR. QUINTERO:  If I may, your Honor, in July --

 3              THE COURT:  Thank you.

 4              MR. QUINTERO:  -- Mr. Arencibia --

 5              MR. TAMEN:  Microphone.

 6              MR. QUINTERO:  Thank you.

 7         In July Mr. Arencibia needed his passport because he

 8    needed to renew his work permit, and -- may I approach with No.

 9    4 -- in September he received his renewal of a work permit.

10         In addition, your Honor -- may I approach?

11              THE COURT:  Yes.

12              MR. QUINTERO:  I show you Defendant's 6.

13         These are what we call pre-suit letters that were sent

14    by attorney Richard Diaz, who Mr. Arencibia hired around this

15    time, maybe a few weeks before these are dated, and under

16    Florida law you're required to give a pre-suit notice before

17    you sue anybody.

18         So Mr. Arencibia, using the government's theory, is

19    planning to flee but he hired a lawyer to sue five different

20    people who defamed him on social media.

21         In addition, your Honor -- I apologize.  I should have

22    been more organized but I was in a hurry this morning.

23         (Pause)

24              MR. QUINTERO:  May I approach with No. 11?

25         In addition, your Honor --
```

1          THE COURT:  I feel like I'm in a civil case.  I said I

2    feel like I'm in a civil case.

3          MR. QUINTERO:  Judge, let me take it one step further.

4    OK.  This is a motion to reopen his immigration case because

5    the order of removal was incorrectly entered.

6          Mr. Arencibia back in 2022 hired Ira Kurzban.  I don't

7    know if the court is familiar --

8          THE COURT:  I am.

9          MR. QUINTERO:  -- with Mr. Kurzban.  Mr. Kurzban is

10   one of the top immigration lawyers not just in the State of

11   Florida but the country.

12         I have provided the court with the three pleadings

13   that were filed in that case back in 2022.  The first is the

14   motion to reopen.  The other document is the government's

15   response.  The third document is the respondent's reply to the

16   government's response.

17         Unfortunately, immigration does not move --

18   immigration court does not move as quickly as we do at the

19   federal criminal court or the federal civil court.  Those

20   documents and those motions have been sitting there for two

21   years.

22         My question, which is rhetorical, is why would

23   Mr. Arencibia hire one of the top immigration attorneys, fight

24   his removal, reopen his case, try to get his residency back if

25   he was literally intending to flee.

1          I believe that those are all the exhibits, your Honor,

2     that I have intended to introduce this morning.  I don't know

3     if the court wants us to proceed to argument.

4          THE COURT:  I want to try to understand the

5     immigration issue.  Residency was revoked?

6          MR. QUINTERO:  Well, what happened was this.

7     Mr. Arencibia was convicted, I believe, in 20 --

8          THE COURT:  2000?

9          MR. QUINTERO:  -- 09 or 2008 of possession of a --

10          THE COURT:  Firearm.

11          MR. QUINTERO:  -- credit card counterfeit device.

12          THE COURT:  OK.  That happened in 2000.  The Judge

13     Moore case?

14          MR. QUINTERO:  That's correct.

15          THE COURT:  OK.

16          MR. QUINTERO:  Based on that, Immigration took him

17     into custody.  He did not have a lawyer.  So he basically

18     signed off on a voluntary removal request.

19          Years later, when he went to see a lawyer, the lawyer

20     said to him, listen, this order should have never been entered

21     to begin with.  It doesn't qualify for an order of removal.  We

22     need to reopen this.  You will get your residency back, if the

23     court grants it, and the proceedings start from scratch.  So

24     that is what Mr. Kurzban is in the process of doing.

25          My point is that why would Mr. Arencibia waste his

1  money, waste his time, hire some of the best lawyers in town

2  to, quote, flee.  That doesn't even make any sense.  But I

3  wanted to bring this information to the court because the agent

4  that testified from HSI made it look like, and he told the

5  truth, he can't be removed no matter what.  He cannot be taken

6  back to Cuba.  That is not going to happen, and these documents

7  show that he has no intention of fleeing.  He wants to fight,

8  he wants to get his residency back, and he will fight this

9  case.

10       That's the point of these documents, your Honor, and I

11  will have more argument when Mr. Tamen finishes.

12       THE COURT:  OK.

13       MR. TAMEN:  Judge, being under investigation is a lot

14  different from being under indictment, especially in the eyes

15  and mind of the defendant.

16       As you can see from all the people in this courtroom

17  here, Mr. Arencibia has a lot of friends and followers and

18  family and supporters in Miami.  That is not something he is

19  going to give up easily.  Lots of people stick around while

20  they are under investigation hoping it is never going to

21  happen.  When they are charged and facing a multi-count

22  indictment and looking at prison time, that provides the

23  motivation to leave.

24       In this particular case we have a defendant who has

25  already demonstrated that he has an ability to sneak out of the

1   United States, go to Mexico, go to Cuba, spend time in Cuba,

2   then come back to the United States either without documents or

3   with fake documents and undetected.  So the ability to flee,

4   plus the motivation to flee, are very serious factors.

5        THE COURT:  Mr. Tamen, I think that those documents

6   may be the best evidence you have on risk of flight, and

7   they're in Spanish and I don't understand them and the

8   testimony was a little thin.  So since it seems like that is

9   sort of the gravamen of that argument, do you have a

10  translation?

11       MR. TAMEN:  I have not exactly a verbatim translation.

12  I have a translation of the gist of the documents.  Perhaps the

13  court interpreter might be willing to read them to the court so

14  we have it on the record.

15       THE COURT:  Well, any -- I mean -- never mind.  I am

16  not going to remind you of the local rules.  You know.

17       So I will tell you that I don't have any familiarity

18  with the documents that you've presented me either from the

19  Bahamas or -- I'm sorry, from Cuba or from Mexico.  I don't

20  know how these searches are conducted.  I don't know how the

21  identification is made, if it is by name or biometrics or what.

22  I don't know how to contextualize these exhibits.

23       I understand the conclusion you want me to draw from

24  them, and I don't know if it is a fair one.

25       MR. TAMEN:  Well, can I re-call the agent, then, who

1    does speak Spanish and can testify to that information?

2           THE COURT:  Can you proffer what the answers will be

3    before we do that because there was somewhat of a dirt -- oh,

4    no.  The HSI agent?

5           MR. TAMEN:  Yes.  The Homeland Security.

6           THE COURT:  Yes.  Can you proffer what it is that he

7    would say?  Mr. Tamen, I am not going to take it without giving

8    you the chance to examine him if you want to.

9           MR. TAMEN:  Basically what he testified to was that

10   these documents show that, first of all, the defendant has

11   permanent residency in Mexico, and, secondly, that he traveled

12   from Mexico to Cuba and stayed in Cuba for some period of time

13   and then came back.

14          The United States Homeland Security keeps track of

15   everybody who leaves the United States and comes back in.  They

16   have no record of the defendant having made this trip to Mexico

17   nor to Cuba, which means that he either had to have left under

18   false documents with a different name or managed to sneak out

19   without documents, which, as we know, it is not difficult to

20   get across the Mexican border in either direction.  So that is

21   the gist of his testimony, and the identification is based on

22   name and date of birth.

23          THE COURT:  OK.  Keep going.

24          MR. TAMEN:  What I have is a summary translation that

25   said:  A document dated December 20, 2023 is an official

1    document from Mexican Immigration authorities certifying status

2    of Cuban national -- that is this defendant -- Boris Arencibia

3    Prestamo as a legal resident, granted on account of family

4    connection, issued by the National Immigration Institute's

5    office in Cancun, Benito Juarez, Quintana Roo state.

6         The document states that Boris Arencibia Prestamo,

7    date of birth September 7, 1973, born in Cuba, applied for

8    permanent resident status on Mexican soil on February 12, 2016.

9    The application was approved after the subject proved to be the

10   father of Mexican national Michael Arencibia Gonzalez.  The

11   applicant was granted permanent resident card No. 11039635.

12        Immigration travel records further indicate that

13   Arencibia Prestamo, passport No. 11059256, flew out of Cancun

14   airport on June 11, 2016 aboard Aeromexico flight 447 and

15   entered Cancun airport on July 20, 2016 on Aeromexico flight

16   4903.

17        THE COURT:  I'm sorry.  What are you reading from?

18        MR. TAMEN:  I'm reading from a translation that I had

19   done.

20        THE COURT:  Of Exhibit 2?

21        MR. TAMEN:  The December 2023.

22        THE COURT:  I can't find dates on these things.

23        MR. QUINTERO:  Judge, I'm fluent in Spanish.

24        THE COURT:  So I'm asking what exhibit it is.

25        MR. QUINTERO:  Your Honor, I am fluent in Spanish and

1    the document that -- Judge, I'm fluent in Spanish.

2              THE COURT:  Which exhibit are we looking at?

3              MR. QUINTERO:  I'm sorry?

4              THE COURT:  I don't know which exhibit this is.

5              MR. QUINTERO:  Oh, I think it is the Government's 2.

6              MR. TAMEN:  Two.

7              MR. QUINTERO:  Government's 2.

8              THE COURT:  I can't find any of the words that you

9    just read on that.

10             MR. QUINTERO:  Yes, that is exactly what I was going

11   to say.  I'm fluent in Spanish and I'm reading and it starts

12   off:  OK.  Attention to a solicitation effectuated on the 8th

13   of August 2023 before this sub-directive of regulation,

14   migratory regulation.

15             THE COURT:  That is page 1, Mr. Quintero.  For a

16   second I thought that Mr. Tamen was reading a translation of

17   page 2, but I'm not finding it on here.

18             MR. TAMEN:  It is a summary.  It is not a verbatim

19   translation.  That is why I would like to have the agent come

20   back.  He is familiar with this type of document.

21             MR. QUINTERO:  I object.  The summary does not

22   coincide with the language of these documents.

23             THE COURT:  Yes.  I'm not asking for a summary.  I

24   want to know -- I mean, this is, like I said, this is the

25   evidence you're hanging your hat on.  I want know what the

1   evidence actually is, not the interpretation of it.

2          MR. TAMEN:  I would like to have the agent testify to

3   exactly what it says and what it is.

4          MR. QUINTERO:  The agent cannot testify to this.

5   These are not, quote -- you can translate the documents,

6   official translation and provide them to the court.  The agent

7   cannot interpret these documents.

8          MR. TAMEN:  He can translate what they say, which is

9   important because --

10          MR. QUINTERO:  No.

11          MR. TAMEN:  -- because he's already identified them as

12   official document of the Mexican government.

13          MR. QUINTERO:  The government can file an official

14   translation of these documents.  I have no objection to that,

15   but I do object to an agent getting up here and attempting to

16   translate a foreign government document.

17          THE COURT:  You know our local rules require a

18   certified interpretation and translation if you are going to

19   admit it as an exhibit, and this is the reason, right, this

20   exact moment where I am being asked, but even with my

21   relatively new-to-Miami knowledge of Spanish, I cannot find

22   what you are reading to me in this section.

23          OK.  Let me just let Mr. Tamen please finish his

24   presentation and we may circle back to these documents.

25          MR. QUINTERO:  Yes, your Honor.

```
1            THE COURT:  Because I interrupted you.

2            MR. TAMEN:  I would request permission to submit an

3    officially-certified interpretation.

4            THE COURT:  When?

5            MR. TAMEN:  As soon as I can get one done, within a

6    couple of days after this proceeding.

7            THE COURT:  Just continue with -- I mean, today is the

8    detention hearing.  You understand?

9            MR. TAMEN:  Well, it was continued at defense request

10   for a couple of weeks.  So I'm just asking for a couple more

11   days for this.

12           THE COURT:  OK.  Why don't you finish your argument

13   and let me circle back to it depending on what else happens.

14           MR. TAMEN:  OK.  In addition to his unauthorized

15   travel to Cuba, which, according to the agent, cancels his

16   parole in the United States -- maybe now the United States is

17   not deporting people to Cuba.  There have been times in the

18   past when it has, and the situation in Cuba could change.  Any

19   change in government there could result in a change in the

20   government's deportation policies.

21           The fact is that he has motivation to return to Cuba

22   because now he's facing potential for years of imprisonment on

23   the indictment.

24           I think it's very important to note that he has

25   actively been involved in business in Cuba as recently as this
```

 1    last summer in promoting a concert there.  The nature of the
 2    Cuban government is well known to everybody in Miami.  They do
 3    not allow free enterprise there.  People do not come in and
 4    hire people and spend money and promote things without the
 5    Cuban government having a hand in it and being a part of it.
 6    The fact that he could stage a concert in Cuba means he clearly
 7    has connections with the Cuban government to get permission to
 8    do all of this.

 9         So I think the risk of flight and his ability to flee
10    are both established, in addition to which we have testimony of
11    the defendant being engaged in two different barroom brawls,
12    and maybe there's a lot of contradiction between different
13    people as to who started it.  Nonetheless, two different times
14    he hit people in the head with bottles and they had contusions,
15    they had lacerations, they went to get treatment afterward.  So
16    it is not normal for --

17         THE COURT:  Do you agree with my characterization that
18    that's based on at least three levels of hearsay?

19         MR. TAMEN:  It's based on the information in the
20    police report which indicated the officers observed lacerations
21    and bruises on the victims.

22         THE COURT:  So only two or three?  It's attenuated.

23         MR. TAMEN:  It's attenuated, but --

24         THE COURT:  And you want me to put that into the
25    bucket of he will follow up with his threats to these

1    witnesses, right?

2            MR. TAMEN:  It shows that he's been involved in

3    violent activity, and we have witnesses who say they are afraid

4    of him.

5            THE COURT:  Right.

6            MR. TAMEN:  They weren't afraid of anybody else in

7    this case.  They are afraid of him.

8            THE COURT:  Advance for danger.

9            MR. TAMEN:  Yes.

10           THE COURT:  On which your burden is clear and

11   convincing evidence.

12           MR. TAMEN:  Yes.

13           THE COURT:  OK.  I wanted to make sure that we agreed

14   on the evidentiary burden.

15           MR. TAMEN:  Yes.

16           THE COURT:  OK.

17           MR. TAMEN:  And the fact that he is associated with

18   it, is holding a benefit for a lieutenant of a major violent

19   drug trafficking organization, also speaks to danger to the

20   community for this type of activity.

21           THE COURT:  Wait.  I beg your pardon.  Say that again.

22           MR. TAMEN:  He went to Puerto Rico to hold a benefit

23   concert for a lieutenant of the Angel Millones drug trafficking

24   organization, and that was in 2023.

25           THE COURT:  OK.  That is likewise being advanced.

```
1              MR. TAMEN:  For danger to the community.
2              He travels in the circles of violent drug traffickers
3    and is looking to help out members of that organization.
4              THE COURT:  OK.
5              MR. TAMEN:  That's all the argument I have, your
6    Honor.
7              THE COURT:  OK.  Mr. Quintero.
8              MR. QUINTERO:  Thank you, your Honor.  If it please
9    the court, the court is well aware of the standard for risk of
10   flight and the standard for danger to the community.
11             There is no question in my mind that the court can
12   fashion a series of conditions.  I don't think the government's
13   met their burden on either.  But I'm saying to the court that I
14   believe the court can fashion conditions which will reasonably
15   assure his appearance at trial and at the same time ease the
16   government's concerns over danger to the community and risk of
17   flight.
18             Once again, I don't think they have met their burden.
19   For the record, your Honor, if I may --
20             THE INTERPRETER:  All the individuals here that are
21   here supporting Boris please stand up.
22             (Pause)
23             THE COURT:  Mr. Quintero, Mr. Quintero, I don't think
24   the marshals love this.
25             Can you have everybody sit back down.
```

1        MR. QUINTERO:  I wanted to show the court the support,

2    and I was going to ask --

3        THE COURT:  But I can see everybody here.  If there is

4    a more specific identification you want me to make, then I

5    invite that, but I don't think the marshals need 40 people on

6    their feet.

7        MR. QUINTERO:  In the courtroom is his wife, your

8    Honor.  Sandra, please stand up.  And some of his children.

9    Would the children please stand up.  Those are some of his

10   adult children.  As you can see everybody else -- you can sit

11   down.

12       Mr. Arencibia, if you look at this indictment, the

13   indictment goes back five years.  The last overt act is 2019.

14   If you look at the, let's say the meat and potatoes of the

15   indictment, there is none.  It is strictly cooperating

16   codefendants that are testifying.  There is no supporting

17   documentation which in any way supports each of the allegations

18   made against him in this indictment.  This man should not sit

19   in jail on that.  That is number one.

20       Number two, if you look at his actions from the

21   moment -- even before I started representing him, the actions

22   are to fight for his residency, to be in the country, and, once

23   again, if he wanted to flee, he clearly would have done it

24   between February of 2023 and before he was arrested.  He didn't

25   need to be removed.  He could have left voluntarily, and he

1    didn't.  He stayed and he worked with me and he came to my

2    office and I explained to him that knowing Mr. Tamen the way I

3    do because I have had cases with him, I told him you're going

4    to get indicted.  It's just a matter of time.  I don't know

5    when it's going to be, but it's going to happen.  And yet he

6    continued to comply with my requests.  He continued to come to

7    my office.  He continued to provide me with information that

8    allowed me to start preparing my defense in this case.

9            Immigration does not normally grant -- I mean, I've

10   never seen it -- a renewal of a work permit when they intend to

11   take you into custody and remove you, remove you from the

12   United States.  That is simply not done.  Yet that work permit

13   was renewed in September of last year for an entire year.

14           So the Pretrial Services report -- very important --

15   recommends a bond.  It recommends a corporate surety with a

16   personal surety.  I'm going to go one step further.  I'm going

17   to ask the court for a 150 corporate surety, followed by 150

18   personal surety cosigned by, as the Pretrial Services report

19   recommends, the wife and one of the adult children or anyone

20   else that you want to cosign on the bond, plus put him on

21   electronic monitoring, GPS electronic monitoring.  Give him the

22   opportunity to work.  That satisfies every concern that the

23   government may have.

24           THE COURT:  Except one.  GPS monitoring only works if

25   the defendant leaves it on his ankle, and as soon as he cuts it

1  off his ankle, it is just a big ugly bracelet that can be left

2  behind in an apartment.

3       What is your response to evidence that twice he left

4  the country under the radar and managed to go and visit Cuba

5  and Mexico and the Bahamas and return surreptitiously without

6  using his passport?  Because that suggests that -- my bond is

7  only as good as someone who is willing to obey it.  So if he is

8  traveling in and out of the country surreptitiously, that

9  doesn't suggest that he would obey my bond or keep his ankle

10  monitor on.

11       MR. QUINTERO:  No.  No, ma'am.  Let me explain.

12  Number one, the 1998 travel was permitted.  I showed you that

13  he had the permission to travel.  OK.  He had the permission to

14  travel.

15       THE COURT:  True.  You're right.  You're right.

16       MR. QUINTERO:  So that one can be removed.

17       THE COURT:  2018.

18       MR. QUINTERO:  All right.  The third travel, the one

19  that the government implied to this court that he traveled to

20  Cuba and the music festival --

21       THE COURT:  They withdrew.

22       MR. QUINTERO:  -- I think we've established that that

23  did not occur.  So that removes that one.  OK.

24       THE COURT:  Uh-huh.

25       MR. QUINTERO:  The remaining travel is a 2016 travel,

1    I believe to Mexico and Cuba, but that was in 2016.

2            Let's assume that that occurred for argument sake.  He

3    came back.  So the travel -- and he hasn't traveled since 2016

4    anywhere.

5            THE COURT:  I'm not treating it, as I sit here right

6    now, as evidence of his intention to go to Cuba as much as I am

7    asking about whether it evidences a willingness to disobey the

8    law for international travel, including a bond that says you

9    can't leave the Southern District of Florida.

10           MR. QUINTERO:  Judge, there is no question that that

11   evidence would be evidence by any judge, OK, of that.  Let's

12   keep in mind that that occurred in 2016.  That's eight years

13   ago.  OK.  There is no evidence that he has done anything over

14   the last eight years, where he's gone out of the country or

15   done anything improper as far as traveling without permission

16   or anything along those lines.

17           Again, that's the report from the Cuban government.  I

18   am not here to admit or deny that situation, but let's assume

19   that it happened.  OK.  That was eight years ago, and,

20   therefore, I don't believe for a second that if your Honor

21   imposes restrictions like I've recommended that there's going

22   to be any problems.

23           Yes, every time your Honor imposes a house arrest with

24   GPS, there is always the risk of the defendant cutting the

25   bracelet off and running, but his family is going to be on the

1    hook, his wife's going to be on the hook.

2              THE COURT:  What about a client?

3              MR. QUINTERO:  I'm sorry?

4              THE COURT:  What about a client, somebody with

5    financial skin in his game, someone whose reputation and

6    livelihood would be injured by his failure to appear in court?

7              MR. QUINTERO:  We have the artist Lenier in court.  We

8    have the boxer I told you about.  Both have agreed -- I've

9    talked to them -- that if you would like them to sign off on

10   the bond, they will sign off on the bond.

11             Actually, if he runs, he is going to lose more than

12   anything because he is going to lose his business, because his

13   business, the vast majority of the business, is production of

14   music.  You've got to be there.  You've got to be with the

15   artist.  You've got to be in the studio to produce the music.

16             THE COURT:  I understand.

17             What are the guidelines that you think he's exposed

18   to?

19             MR. QUINTERO:  All right.  I'm glad you asked me.  In

20   anticipation of this, I asked Mr. Tamen if he could provide me

21   to an estimate -- I wouldn't hold him to it -- on the money

22   laundering conspiracy, because that is the one that carries the

23   highest baseline on the guidelines, and he could not.  So I'm

24   at a little bit of a loss here because if you look at the

25   indictment, the indictment reflects $400,000.

```
 1              THE COURT:  OK.  But I was wondering what your

 2    estimate was for a reason.  If Mr. Tamen knows, he will proffer

 3    it for me.

 4              Have you calculated the guidelines or do you have a

 5    sense of where you think -- well, let me say it this way.  If

 6    it is good for the government, will you tell me what the

 7    estimated guideline range is, and if you don't --

 8              MR. TAMEN:  I have not done that, your Honor, because

 9    we have so many pages of bank records and financial records.

10              The overall conspiracy involved traced movement of $78

11    million.  So this is a big operation.  Now this defendant was

12    only involved in a portion of that.

13              THE COURT:  Right.

14              MR. TAMEN:  It is much less than 78 million.  How many

15    millions or hundreds of thousands is something that is going to

16    require a lot of accounting to come up with.  I just have not

17    been able to do that.  Different defendants in this case have

18    received sentences ranging from three years to 15 years'

19    imprisonment.

20              THE COURT:  Who got 15?

21              MR. TAMEN:  Lazaro Hernandez.

22              THE COURT:  Hernandez.  Lazaro Hernandez.  Where is my

23    indictment?

24              MR. QUINTERO:  Judge, if you look at my list --

25              THE COURT:  Right.
```

1      MR. TAMEN:  -- he is the last one on that list.  It is

2  Exhibit 9.

3          THE COURT:  Mr. Quintero, be patient.

4          MR. QUINTERO:  At the bottom page on this case.

5          THE COURT:  I've got it.  Got it.  Got it.

6          MR. QUINTERO:  Mr. Hernandez had a $1 million personal

7  surety bond, a $100,000 corporate surety bond, and a 300,000 10

8  percent bond with Nebbia cosigned by -- I don't know who that

9  person is.  I think that is his sister, but I am not 100

10  percent sure.

11          THE COURT:  OK.

12          MR. QUINTERO:  By the way, the allegations against

13  Mr. Hernandez was that he was involved in a $300 million scam

14  using adulterated pharmaceuticals.

15          MR. TAMEN:  That was a different case.

16          MR. QUINTERO:  What is that?

17          MR. TAMEN:  That was a different case.  Mr. Hernandez

18  had two different cases.  But in this case he was sentenced to

19  approximately 15 years' imprisonment.

20          This defendant Arencibia is probably somewhat less

21  culpable than that.  So I think it's safe to say he would

22  probably be somewhat less than 15 years, but how much less than

23  that I'm not prepared to say at this point.

24          THE COURT:  Is Frank Alvarez the codefendant Angel

25  Alvarez in this case?

```
 1              MR. TAMEN:  No.  They are two different people.

 2              THE COURT:  Were any of the other two codefendants in

 3    this case sentenced?

 4              MR. QUINTERO:  Mr. Alvarez was given a 250,000

 5    personal surety bond.

 6              THE COURT:  I appreciate that, but defendants are so

 7    individual that what one gets as a bond, it is just very

 8    difficult to extrapolate to another bond.

 9              MR. QUINTERO:  I know.

10              THE COURT:  I was really only trying to estimate if

11    anybody knew a basis to say what exposure the defendant is

12    looking at because it is often a factor that is argued at

13    detention hearings.  That was the limited basis of my inquiry.

14              MR. QUINTERO:  I don't know --

15              THE COURT:  If nobody knows, it's OK.

16              MR. QUINTERO:  -- because I tried to get a number

17    from -- but Mr. Tamen is correct.  He and I dealt with each

18    other many, many times over the years.  Very straightforward

19    guy.  He told me, look, I haven't made the calculation, so I

20    can't tell you.

21              THE COURT:  No problem.  Sometimes we have it,

22    sometimes we don't.  I didn't mean to distract us all.  We

23    don't have it.  Got it.

24              MR. QUINTERO:  Right.  That's correct.

25              THE COURT:  I'll just move on.
```

1           OK.  I think I've asked all the questions that I

2     intended to ask you.

3           Did you have a fulsome chance to make your proffer?

4           MR. QUINTERO:  I'm done, your Honor.

5           THE COURT:  Do either of you have information about

6     the carrying concealed firearm arrest in 2010?  If the answer

7     is no, it is OK.  I just want to know if anybody has

8     information about it.

9           MR. QUINTERO:  I have no information; however, the

10    Pretrial Services report --

11          THE COURT:  Says no action.

12          MR. QUINTERO:  That was no actioned.

13          THE COURT:  Yes.

14          MR. QUINTERO:  That was no action, according to the

15    Pretrial Services report.

16          THE COURT:  I see that.  That is why I'm asking if

17    anybody had any additional information.

18          MR. TAMEN:  I do not.

19          THE COURT:  OK.

20          MR. QUINTERO:  I do not, your Honor.

21          THE COURT:  OK.  Mr. Tamen, you get last word.  It is

22    your motion.

23          MR. TAMEN:  I will be brief, your Honor.  The

24    defendant has both a motive and the ability to flee the

25    country.  He has business connections in Cuba and ties with the

1    Cuban government; otherwise, he would not be staging major

2    concerts there.  He may have gone through efforts to finalize

3    his status, his work permit, and other matters.  That all took

4    place before he was under indictment.

5            So the reason he was doing that is because he did not

6    know that he was going to be prosecuted.  But when the

7    indictment hits him and the cuffs are put on him, it changes

8    the outlook that any defendant would have, and so I think that

9    there is too much of an incentive.

10           He has a lot of cash inflow.  He has a high net worth.

11   He has ability to move money.  And I don't think that he is

12   likely to appear for trial if he is given a bond, and I also

13   feel that there is implicit in his behavior, and what the

14   witnesses have said about him, a threat of obstruction of

15   justice.

16           THE COURT:  When you say witnesses plural, the proffer

17   with respect to the witness threats was not clear and

18   convincing evidence.  I find myself very much wanting in the

19   department of what occurred there because there are serious

20   allegations, but the agent's ability to substantiate it was

21   lacking.  It is the kind of thing that if it happened, it would

22   prevent a bond, and I just don't --

23           MR. TAMEN:  You're talking about the barroom brawls?

24           THE COURT:  No.  The barroom brawls, Mr. Tamen,

25   candidly, the 2018 event happened before he appeared in front

1    of Judge Moore, who gave him a bond in 2000.  So to the extent

2    we are reaching as far back as 2018 for circumstances that

3    characterize him as too dangerous to have a bond in this case,

4    if he wasn't in 2000, it becomes pretty hard for me to not give

5    him a bond because of something that in 2000 another judge said

6    he's bondable, knowing the exact same circumstances.

7         So the '23 event, again, doesn't lead to an arrest.

8    The circumstances are very contested.  At most, I know that he

9    was involved in a fight and I don't have anything else to

10   attribute in terms of like how likely that makes him to do what

11   you are afraid he is going to do, and that is specifically to

12   tamper a witness.

13        The other -- no, I won't go there.

14        The argument that he only has the incentive to flee

15   once the indictment comes down, I mean, the correspondence with

16   Mr. Quintero to your office as far back as April anticipates

17   indictment and charges and an arrest and seeks self-surrender.

18   So to suggest that he did not then anticipate answering to an

19   indictment in this case I think is, again -- I mean, sometimes

20   these things come out of the blue.  This one didn't.

21        MR. TAMEN:  No, he knew he was under investigation,

22   but I said a person's mindset changes when it actually happens

23   as opposed to being told this is likely to happen in the

24   future, and most people just say, well, we'll wait and see, how

25   bad can it be, whether it is going to happen or not.

1          For a long time nothing was happening so he stayed

2     here.  He didn't have the incentive.  There is nothing for him

3     to flee from at that point because he was only under

4     investigation.  Once he is facing the charges and looks at the

5     indictment and sees that they're significant charges and he

6     knows that about 15 other people involved have all gone to

7     prison as a result of this same indictment, that is a very

8     different incentive, a much more powerful incentive to flee

9     than what he had.

10         In terms of the witnesses, they just contacted the

11    agent, three of them, and said that they were concerned for

12    their safety as a result of cooperating against Boris

13    Arencibia.

14         THE COURT:  I think I only heard testimony about two.

15         MR. TAMEN:  Even if it was two --

16         THE COURT:  Well, right, but one I understand said

17    what's my exposure; I understand he's been arrested.  The other

18    two years ago said he was contacted by a member of his security

19    team.

20         MR. TAMEN:  Right, who told him that I work for Boris

21    and he has sources in law enforcement and we found out you're a

22    confidential informant or confidential source and we're looking

23    for those people.  I mean, why would somebody do this if they

24    didn't intend to intimidate people, and if the intimidation

25    doesn't work, then they can take the next step, and that is

1    what witnesses are afraid of.

2              They have a expressed fear of only Boris Arencibia,

3    not of the other 14 or 15 other people that were prosecuted in

4    this case, many of them as a result of cooperating witnesses.

5    He is the one that stands out.  He is the one that witnesses

6    have said they're afraid of.

7              THE COURT:  OK.  I think I understand.

8              Have you had a fulsome chance to make your argument

9    too?

10             MR. TAMEN:  I have concluded my argument.

11             THE COURT:  OK.  Officer Ingleses, can I speak to you

12   in chambers?

13             To the marshals, do I have ten more minutes?

14             THE MARSHAL:  Yes, your Honor.

15             THE COURT:  OK.

16             THE DEPUTY CLERK:  All rise.

17             (Recess)

18             THE DEPUTY CLERK:  All rise.  Court is now in session.

19             THE COURT:  Go ahead and have a seat.

20             All right.  I wanted to speak to the probation officer

21   about conditions before I made a final decision.

22             I'm going to tell you, Mr. Quintero, in all candor,

23   that the proffer of ties to the Cuban government is a unique

24   set of circumstances, the likes of which I haven't had to

25   address at a detention hearing before.

1        In this case it is substantiated by the indisputed

2   fact that he was able to conduct business, promote and profit

3   from something that occurred in Cuba as recently as this

4   summer.  That and other facts -- the other ground on which the

5   government here moves with respect to danger to the community I

6   just don't find you have met the evidentiary burden.  It is

7   just not clear and convincing evidence with respect to the

8   proffer of witness tampering.

9        They are serious allegations, but they are

10   unsubstantiated for purposes of this hearing and this hearing

11   alone and on the witness' testimony that, as I've indicated, is

12   several layers of hearsay, including the police reports.  But

13   on a preponderance standard, a risk of flight I find, a serious

14   risk of flight, these are unique circumstances and facts here

15   that are advanced.

16        I have, as you heard, as I questioned you here,

17   considered what conditions I think would reasonably assure,

18   because it is twofold.  Yes, there is a serious risk of flight

19   here.  Nonetheless, are there conditions or combination of

20   conditions that I could impose that would reasonably assure,

21   and it doesn't have to be 100 percent, but it has to be

22   reasonable, and I tell you I have tried.  I do not think there

23   are reasonable combination of factors here that assure his

24   appearance as required.  Not just his flight, but his

25   appearance before a court as required as a condition of his

```
 1    release.

 2            I know you want to be heard.

 3            MR. QUINTERO:  May I bring something to your Honor's

 4    attention?

 5            THE COURT:  Sure.

 6            MR. QUINTERO:  The artist events or event in Cuba is

 7    permitted by law.

 8            THE COURT:  By which law?  By whose law.

 9            MR. QUINTERO:  The embargo.  Cultural exchanges are

10    exempt from embargo violations.  OK.  So whether it is an

11    artist or a poet or a musician, going there and performing

12    there --

13            THE COURT:  So is the proffer that he didn't violate

14    U.S. law?

15            MR. QUINTERO:  Correct.

16            THE COURT:  My finding isn't based on, and I think

17    that the evidence here would be not enough for me to find that

18    he violated U.S. law, nor has anyone advanced a specific law

19    that was violated, but then again, apparently I heard proffers

20    that were withdrawn.

21            So I don't think anyone made the argument that it was

22    in violation of U.S. law, but, rather, that his participation

23    in it could not have occurred but for his approval by the Cuban

24    government, coupled with a rather specific proffer of a plan B.

25            Now, generally speaking, a cooperator's proffer
```

1    through an agent is of limited weight because of how I'm

2    receiving it.  This one was very specific and it is somewhat

3    corroborated by the undisputed fact that he is participating

4    and promoting and benefiting from this event as recently as

5    this summer in Cuba.  Meaning it is no one fact alone, but that

6    is, I would just note, a very unique fact, the likes of which I

7    have not had advanced at a detention hearing before.

8           I am going to reduce it to a written order, and it is

9    indicted, and Judge Gayles may see it differently.  When I

10   write it up and you compare it to a transcript, if nothing else

11   we have at least heard one incident where you and I both heard

12   testimony that then the agent or prosecutor denounced.  So if

13   you think I got it wrong, Judge Gayles may see it differently,

14   but that is how I am writing it up.

15          MR. QUINTERO:  Very well, your Honor.

16          THE COURT:  I do appreciate the presentation and the

17   thoughtfulness that went into it, and I have gone through the

18   exhibits.  I will caution the government that I can't accept a

19   Spanish-language exhibit.  Our local rules require that it be

20   advanced with a certified translation.  So it is not an exhibit

21   to this hearing.  If an appeal is taken, though, and before you

22   try to advance it to Judge Gayles, it has to be translated.

23          OK.  I know you are disappointed, Mr. Quintero, as are

24   your client and his supporters in here.  I have given it, I

25   promise you, every consideration.

1        MR. QUINTERO:  I understand the court.  I understand

2   where your head is at.  OK.  I just thought that there could be

3   a combination of conditions like, for example, you said what

4   about third parties having a financial stake in the outcome.

5   So, for example, you could impose whatever restrictive

6   conditions and then on top of whatever corporate surety bond a

7   personal surety bond for a million dollars, signed by some of

8   these individuals that would have a financial stake in

9   Mr. Arencibia if he decides to take off.  That is what I'm

10  thinking.

11       Again, I am not the court.  So I am just bringing that

12  up because you mentioned it.  So in my mind I said, sure, no

13  problem.

14       THE COURT:  I promise you I considered that and others

15  and had a conversation with my Pretrial Services officer to

16  explore others still.  That's the determination.

17       Like I said, I will write it up and give you a chance

18  to reflect on it and challenge it, as is your right.  Judge

19  Gayles may see it differently, and the benefit of a transcript

20  may see it differently.

21       MR. QUINTERO:  Thank you, Judge.

22       THE COURT:  Thank you, Mr. Quintero.

23       MR. QUINTERO:  Thank you for your time.

24       THE COURT:  Appreciate it.

25       OK.  With that, everyone is excused.

1        We have a grand jury that is waiting, so I appreciate

2   a quick but safe exit from the courtroom so we can take the

3   grand jury, please.

4        (Adjourned)

5

6                    C E R T I F I C A T E

7

8       I hereby certify that the foregoing is an accurate

9   transcription to the best of my ability of the digital audio

10  recording in the above-entitled matter.

11

12  February 22, 2024        s/ Joanne Mancari
                             Joanne Mancari, RPR, CRR, CSR
13                           Court Reporter
                             jemancari@gmail.com
14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**31 Notarial Office**
Paulina Gómez González

*[Translation into English of an original document written in Spanish]*

**DR. PAULINA GOMEZ GONZALEZ**
**NOTARY THIRTY-ONE (31) IN AND FOR THE CIRCUIT OF MEDELLIN – COLOMBIA**
Carrera 81 No. 37-57

**ENTRY NUMBER 591**
**ACCEPTANCE CERTIFICATE OF STATEMENT FOR OUT-OF-COURT PURPOSES**

In the District of Medellin, Department of Antioquia, Republic of Colombia, on the TWENTY-EIGHTH (28) day of **FEBRUARY, TWO-THOUSAND TWENTY-FOUR (2024)**, at **NOTARIAL OFFICE THIRTY-ONE (31)** for the Medellin Circuit, headed by Notary Public DR. **PAULINA GOMEZ GONZALEZ**, there appeared **SANTIAGO AGUDELO QUIROS** in order to provide statements for out-of-court purposes, in accordance with the provisions of Decree 1557 of July 1989, said sworn statement deemed to have been given in compliance with current procedural regulations and in the following terms.

My name as stated is: **SANTIAGO AGUDELO QUIROS**
**MARITAL STATUS: SINGLE**
**ADDRESS:** ██████████████████ **BARRIO SIMON BOLIVAR TELEPHONE:** ███████ **69**
**OCCUPATION: SELF-EMPLOYED**
**IDENTIFICATION: CITIZENSHIP IDENTIFICATION CARD [cedula] NUMBER** ████████ **FROM MEDELLIN – PASSPORT** ████████

Under solemn oath, I hereby state that I have personal and full knowledge of the following facts - **THAT I, SANTIAGO AGUDELO QUIROS, IDENTIFIED BY CITIZENSHIP ID CARD NUMBER** ████████ **FROM MEDELLIN AND PASSPORT** ████████, **IN MY OWN BEHALF AND AS MAJORITY SHAREHOLDER OF BLANK CANVAS HOSPITALITY S.L, OF LEGAL AGE, SINGLE, CAPITAL RENTIER, RESIDENT OF MEDELLIN-ANTIOQUIA (COLOMBIA), WITH DOMICILE LOCATED ON** ████████████, **SIMRAN BLDG, BEARER OF COLOMBIAN PASSPORT NUMBER** ████████, **AND HOLDER OF CURRENT N.I.E. [Spanish Foreigner Identification Number]** - Z1060477K FROM SPAIN, I SWEAR TO THE FOLLOWING: **1. THAT MY NAME AND PERSONAL INFORMATION ARE AS PREVIOUSLY INDICATED. 2. THAT BLANK CANVAS HOSPITALITY S.L. IS A SPANISH ENTERPRISE, CREATED BY VIRTUE OF ARTICLES OF INCORPORATION FOR A LIMITED LIABILITY COMPANY NUMBER 1,372 BEFORE NOTARY ALEJANDRO MARCOS HIDALGO, ON AUGUST 4TH, 2023. 3. THAT BLANK CANVAS HOSPITALITY S.L IS THE ONLY ORGANIZING COMPANY OF THE SANTA MARIA MUSIC FEST, WHICH TOOK PLACE DURING THE MONTH OF AUGUST, 2023 AND ON FUTURE UPCOMING DATES, ON *CAYO SANTA MARIA*, CUBA. 4. THAT AS PART OF THE PRODUCTION OF EVENTS FOR THE ABOVEMENTIONED FESTIVAL, THE SERVICES OF A PRIVATE COMPANY REGISTERED IN CUBA WERE CONTRACTED , SUCH AS "SOLUCIONES INTEGRALES CUBA." THIS COMPANY, IN TURN, SUBCONTRACTED THE SERVICES OF SEVERAL ARTISTS MANAGED BY "CARIBE PROMOTIONS", HEADED BY BORIS ARENCIBIA.**

*[Printed on Notarial Stationery: SNR Office of the Superintendent of Notaries Public and Registration Carrera 81 #37-45 PBX: 4483450 notaria31.medellin@supernotariado.gov.co Medellin – Colombia*

*[Marginal Notes: 02/11/2023      3G594XLLE4UCCNTB      BAR & QR CODE: SGC481052563]*
*[Top Right Blue Ink Round Seal/Initials: Notarial Office 31 for the Medellin Circuit – PAULINA Gómez González – Republic of Colombia]*

**31 Notarial Office**
Paulina Gómez González

MR. ARENCIBIA'S INVOLVEMENT WITH THE SANTA MARIA MUSIC FESTIVAL WAS LIMITED TO FACILITATING THE PARTICIPATION OF THE ARTISTS AT THE BEHEST OF SOLUCIONES INTEGRALES CUBA ON BEHALF OF BLANK CANVAS HOSPITALITY S.L. THEREFORE, BORIS ARENCIBIA HAD NO INVOLVEMENT WHATSOEVER IN ORGANIZING THE SANTA MARIA MUSIC FESTIVAL. 5. THAT EVERYTHING STATED ABOVE IS THE TRUTH AND NOTHING BUT THE TRUTH. IF ANY OF THE FACTS DESCRIBED HERETOFORE WERE FOUND TO BE FALSE, I ACKNOWLEDGE THAT SUCH STATEMENTS WOULD CONSTITUTE PERJURY AND AS SUCH I WOULD BE SUBJECT TO CRIMINAL PROSECUTION PURSUANT TO THE FEDERAL LAWS OF THE UNITED STATES AND OF THE STATE OF FLORIDA. ------------------------------------------------------------------------------------------------

The following statement is addressed: **TO WHOM IT MAY CONCERN**

**NOTARIAL RECORD:** The undersigned Notary advises the affiant(s) that for all proceedings before an administrative authority or any other authority, out-of-court sworn statements before a notary have been abolished and are not required. An affirmative statement under oath made by the interested party before any such authority would suffice (Art. 7 decree 019 of 2012, amended by decree 053 dated January 13, 2012)- ------------------------------------------------------------------------------------------------

Notwithstanding the previously given warning, the declarant(s) insisted before the Notary that the statement contained herein be drafted (Art. 3 & 4 of Decree 960 from 1970 Rogatory Principle*).--------------------------
[*Translator's Note: Rogatory in this sense means plea or request from interested party]
The declarant appeared to be of sound mind and expressed himself clearly. As there is no other purpose for this proceeding, it is thus concluded, the affiant and the Notary having signed for the record. The declarant's right index fingerprint is affixed hereto.------------------------------------------------------------------------------------------
**Warning.** The notary indicates that the declarations recorded in the present document reflect the statements made, therefore, the individual(s) signing must read them carefully. Any modification, correction, or addition deemed to be necessary must be committed to writing in a new statement, incurring the corresponding charges in accordance with the official rates. Article 56, decree 188 from 2013, incorporated by decree 1069 of 2015, fees incurred **$18.000**, resolution 00773, dated January 26, 2024, issued by the Office of the Superintendent of Notarial Offices and Registration, VAT **$3.420**, total **$21.420**.
Decree 1000 dated May 15, 2015; biometric fees **$5.236** ------------------------------------------------------------------------
**Note:** The extended text was prepared according to statement sent by electronic means.


**AFFIANT(S)**
  /s/ Illegible signature
**SANTIAGO AGUDELO QUIROS**
CC *1 017 186 629*
AP [illegible]


[ILLEGIBLE SIGNATURE AND SEAL]


PAULINA GOMEZ GONZALEZ
NOTARY THIRTY-ONE (31) IN AND FOR
THE CIRCUIT OF MEDELLIN

**31 Notarial Office**
Paulina Gómez González



**NOTARY THIRTY-ONE (31) IN AND FOR
THE CIRCUIT OF MEDELLIN**

**OUT OF COURT STATEMENT**

mncpb

[IMAGE REPLICATED]

Biometric Confirmation – Law-Decree 19 of 2012
2024-02-28 09:04:52

Before the undersigned Notary Public Number Thirty-one in and for the Circuit of Medellin, there appeared AGUDELO QUIROS SANTIAGO C.C. [ID Card] ███████████

[Who] authorized the use of his personal data once his identity was confirmed after comparing his fingerprints and biographical data with the database maintained by the National Registry on Civil Status [*Vital Statistics*]. Go to www.notariaenlinea.com to verify this document. ACTA 591

IDENTIFIED WITH PASSPORT ███████. Indicates acknowledgment with his signature

x   *Illegible signature*         .
       Signature

# THIS SPACE INTENTIONALLY LEFT BLANK

# THIS SPACE INTENTIONALLY LEFT BLANK

[*ILLEGIBLE SIGNATURE*]

**NOTARY THIRTY-ONE (31) IN AND FOR THE CIRCUIT OF MEDELLIN
PAULINA GOMEZ GONZALEZ**

[**Marginal Notes:** 02/11/2023    9KIMZCAILPMY7N9F     BAR CODE & QR CODE: SGC681052562]

[**Blue Ink Round Seal/Initials at top right**: Notarial Office 31 for the Medellin Circuit – PAULINA Gómez González – Republic of Colombia]

[**Black Ink Round Seal**: Notarial Office 31 for the Medellin Circuit – PAULINA Gómez González – Republic of Colombia]

legis

República de Colombia

Page replicated from original document








B1/B2

JAN 1

## REPUBLICA DE COLOMBIA



**Tipo / Type**
P

**Cod. país / Country code**
COL

**Pasaporte Nº / Passport No.**
▮▮▮▮▮

**Apellidos / Surname**
**AGUDELO QUIROS**

**Nombres / Given names**
**SANTIAGO**

**Nacionalidad / Nationality**
**COLOMBIANA**

**Fecha de nacimiento / Date of birth**
26 MAY/MAY 1990

**Núm. personal / Personal No.**
▮▮▮▮▮

**Sexo / Sex**
M

**Lugar de nacimiento / Place of birth**
**MEDELLIN COL**

**Fecha de expedicion / Date of issue**
09 JUL/JUL 2014

**Autoridad / Authority**
**G. ANTIOQUIA**

**Fecha de Vencimiento / Date of expiry**
08 JUL/JUL 2024

**Firma del titular / Holder's signature**

PASAPORTE
PASSPORT



P<COLAGUDELO<QUIROS<<SANTIAGO<<<<<<<<<<<<<<<<
▮▮▮▮▮▮▮<9COL9005260M2407083CC▮▮▮▮▮▮▮▮<<90

República de Colombia — legis

**IN MY CAPACITY AS NOTARY NO. THIRTY-ONE (31)**
**IN AND FOR THE CIRCUIT OF MEDELLIN**

**I HEREBY CERTIFY**

That this document is a true copy and has been formally recorded in the files
maintained with this Notarial Office, duly authorized.

[ILLEGIBLE SIGNATURE]

**28 FEB 2024**

**PAULINA GOMEZ GONZALEZ**
**PUBLIC NOTARY THIRTY-ONE (31) FOR MEDELLIN**

*[Marginal Notes: 02/11/2023    3I7MI00UJI1SK0L0    BAR CODE & QR CODE: SGC281052564]*
*[Blue Ink Round Seal: Notarial Office 31 for the Medellin Circuit – PAULINA Gómez González – Republic of Colombia]*

## CERTIFICATE OF ACCURACY

STATE OF FLORIDA        )
                        ) §
COUNTY OF MIAMI-DADE  )

I, ___*MARGARITA LLOYD-GODSK*___ , HEREBY STATE AND AFFIRM THAT I AM A FEDERALLY CERTIFIED COURT INTERPRETER, SO QUALIFIED UPON WRITTEN AND ORAL EXAMINATIONS BY THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, AS WELL AS A PROFESSIONAL ACCREDITED TRANSLATOR, FULLY VERSED IN THE SPANISH AND ENGLISH LANGUAGES; AND THAT, *TO THE BEST OF MY ABILITY AND BELIEF*, THE FOREGOING TRANSLATION CONSISTING FIVE (5) PAGES, ATTACHED HERETO, IS TRUE AND CORRECT.

RE: AFFIDAVIT OF SANTIAGO AGUDELO QUIROS (COLOMBIA)

*Margarita Lloyd-Godsk*

DBA *MARGARITA LLOYD TRANSLATION SERVICES*
U.S. COURTS CERTIFIED INTERPRETER
A.T.A. ACCREDITED TRANSLATOR

MARCH 12, 2024

Margarita Lloyd

Digitally signed by Margarita Lloyd
Date: 2024.03.12 15:31:26 -04'00'

**DRA. PAULINA GÓMEZ GONZÁLEZ**
**NOTARIA TREINTA Y UNO (31) DEL CÍRCULO DE MEDELLÍN - COLOMBIA**
Carrera 81 No 37 - 57

**ACTA NÚMERO 591**
**ACTA DE RECEPCIÓN DE DECLARACIÓN CON FINES EXTRAPROCESALES**

En el Distrito de Medellín, Departamento de Antioquia, República de Colombia, a los **VEINTIOCHO (28)** días del mes de **FEBRERO** del año **DOS MIL VEINTICUATRO (2024)**, al Despacho de la **NOTARÍA TREINTA Y UNO (31)** del Círculo de Medellín, siendo notaria titular la Doctora **PAULINA GÓMEZ GONZÁLEZ**, compareció **SANTIAGO AGUDELO QUIROS**. Con el propósito rendir declaraciones con fines extraprocesales, de conformidad con las prescripciones del Decreto 1557 de julio 1989 y que procede a hacer bajo la gravedad del juramento que se considera prestada conforme lo disponen las normas procedimentales vigentes y en los siguientes términos.

Mi nombre es como queda expresado: **SANTIAGO AGUDELO QUIROS**
ESTADO CIVIL: **SOLTERO**
DIRECCIÓN: ███████████████████████████ **BARRIO SIMON BOLIVAR**
TELÉFONO: █████ **97 69**
OCUPACIÓN: **INDEPENDIENTE**
IDENTIFICADO(A) CON: **CEDULA DE CIUDADANÍA NÚMERO** ████████ DE **MEDELLÍN – PASAPORTE** ████████

Declaro bajo la gravedad del juramento los siguientes hechos que son personales y de mi entero conocimiento **QUE YO SANTIAGO AGUDELO QUIROS IDENTIFICADO CON CEDULA DE CIUDADANÍA NÚMERO 1████629 DE MEDELLÍN Y PASAPORTE ████████. EN MI CARÁCTER PERSONAL Y COMO ACCIONISTA MAYORITARIO DE BLANK CANVAS HOSPITALITY S.L., MAYOR DE EDAD, SOLTERO, RENTISTA DE CAPITAL, VECINO DE MEDELLÍN-ANTIOQUIA (COLOMBIA), CON DOMICILIO EN LA CALLE CLL, ████████████████████████, EDIFICIO SIMRAN, CON PASAPORTE COLOMBIANO NÚMERO ████████, Y CON N.I.E. ESPAÑOL VIGENTE NUMERO - Z1060477K, BAJO JURAMENTO DECLARO LO SIGUIENTE: 1. QUE MI NOMBRE Y DEMÁS CIRCUNSTANCIAS PERSONALES SON LAS ANTES INDICADAS. 2. QUE BLANK CANVAS HOSPITALITY S.L. ES UNA ENTIDAD ESPAÑOLA, CREADA EN VIRTUD DE LA ESCRITURA DE CONSTITUCIÓN DE SOCIEDAD LIMITADA NÚMERO 1,372, ANTE EL NOTARIO ALEJANDRO MARCOS HIDALGO, EL 4 DE AGOSTO DE 2023. 3. QUE BLANK CANVAS HOSPITALITY S.L ES LA ÚNICA EMPRESA ORGANIZADORA DEL SANTA MARÍA MUSIC FEST, CELEBRADO DURANTE EL MES DE AGOSTO DEL AÑO 2023 Y FUTURAS FECHAS POR REALIZAR, EN EL CAYO SANTA MARÍA, CUBA. 4. QUE COMO PARTE DE LA PRODUCCIÓN DE LOS EVENTOS DEL MENCIONADO FESTIVAL SE CONTRATARON LOS DE SERVICIOS DE UNA EMPRESA PRIVADA REGISTRADA EN CUBA COMO SOLUCIONES INTEGRALES CUBA. ESTA EMPRESA, A SU VEZ, SUBCONTRATÓ LOS SERVICIOS DE VARIOS ARTISTAS MANEJADOS POR CARIBE PROMOTIONS, LA CUAL ES DIRIGIDA POR**







BORIS ARENCIBIA. LA PARTICIPACIÓN DEL SR. ARENCIBIA EN EL SANTA MARÍA MUSIC FESTIVAL SE LIMITÓ A FACILITAR LA PARTICIPACIÓN DE LOS ARTISTAS A PETICIÓN DE SOLUCIONES INTEGRALES CUBA A NOMBRE DE BLANK CANVAS HOSPITALITY S.L. POR LO CUAL, BORIS ARENCIBIA NO TUVO PARTICIPACIÓN ALGUNA EN LA ORGANIZACIÓN DEL SANTA MARÍA MUSIC FESTIVAL. 5. QUE LO ANTERIORMENTE DECLARADO ES LA VERDAD Y SOLAMENTE LA VERDAD. DE RESULTAR FALSO CUALQUIER DATO DE LOS MENCIONADOS ANTERIORMENTE, RECONOZCO QUE CONSTITUIRÁ PERJURIO Y COMO TAL SERÍA PROCESADO CRIMINALMENTE CONFORME A LAS LEYES FEDERALES DE LOS ESTADOS UNIDOS Y LAS DEL ESTADO DE FLORIDA. --------------------------------------------------------

La siguiente declaración se destina para: **A QUIEN PUEDA INTERESAR**

**CONSTANCIA NOTARIAL:** La suscrita Notaria informa al(los) declarante(s) que en todos los trámites ante autoridad administrativa o de cualquier índole, se suprimieron como requisito las declaraciones extrajudiciales ante notario. Bastaría la afirmación bajo juramento que haga el particular ante la autoridad (Art. 7 decreto 019 de 2012 corregido por el decreto 053 de enero 13 de 2012) -------------------------------------------------
No obstante, lo anterior el(los) declarante(s) insistieron ante la Notaria, la elaboración de la Presente declaración. (Art. 3 y 4 del Decreto 960 de 1970 Principio de Rogación) ------------
El declarante reveló mente sana y se expresó con claridad. No siendo otro el objeto de la presente diligencia, se da por terminada, firmando en constancia la (el) declarante y la Notaria. Se imprime la huella dactilar del dedo índice derecho del (la) declarante.
**Advertencia.** La notaría advierte que las declaraciones emitidas en el presente documento son el reflejo de lo declarado, por tanto, quienes las suscriben deben leerlas cuidadosamente antes de firmarla. Cualquier modificación, corrección, o agregado que pretenda hacerse deberá consignarse en una nueva declaración con su respectivo costo por tarifa oficial. Artículo 56, decreto 188 del 2013, compilado por el decreto 1069 del 2015, derechos causados **$18.000**, resolución 00773, del 26 de enero de 2024, proferida por la superintendencia de notariado y registro, IVA **$3.420**, total **$21.420**. --------------------------------
Decreto 1000 del 15 de mayo de 2015, derechos de biometría **$5.236** -----------------------

**Nota:** El texto extendido se realizó conforme a declaración enviada por medio electrónico

**DECLARANTE (S):**

**SANTIAGO AGUDELO QUIROS**
C.C 1.017.186.629
n° 813324.

**PAULINA GÓMEZ GONZÁLEZ**
**NOTARIA TREINTA Y UNO (31) DEL CÍRCULO DE MEDELLÍN**



## NOTARÍA TREINTA Y UNO (31) DEL CÍRCULO DE MEDELLÍN

Notaría
Paulina Gómez Gonzalez

### DECLARACIÓN EXTRAJUICIO

Verificación Biométrica Decreto-Ley 19 de 2012

2024-02-28 09:04:52

Ante la suscrita Notaria Treinta y úno (31) del Círculo de Medellín Compareció:
AGUDELO QUIROS SANTIAGO  C.C. 1017180629



mncpb

Y autorizó el tratamiento de sus datos personales al ser verificada su idenlidad cotejando sus huellas digitales y datos biográficos contra la base de datos de la Registraduría Nacional del Estado Civil. Ingrese a www.notariaenlinea.com para verificar este documento. ACTA 591. IDENTIFICADO CON PASAPORTE AP837329 En constancia firma.

X Santiago Agudelo Quiroz

**FIRMA**

# ESPACIO EN BLANCO

# ESPACIO EN BLANCO

**NOTARIA TREINTA Y UNO (31) DEL CIRCULO DE MEDELLÍN**
**PAULINA GOMEZ GONZALEZ**

8235



B1/B2
JAN 1

# REPUBLICA DE COLOMBIA

PASAPORTE
PASSPORT

Tipo / Type — Cod. pais / Country code — Pasaporte Nº / Passport No.

P   COL

Apellidos / Surname
**AGUDELO QUIROS**

Nombres / Given names
**SANTIAGO**

Nacionalidad / Nationality
**COLOMBIANA**

Fecha de nacimiento / Date of birth
**26 MAY/MAY 1990**

Núm. personal / Personal No.
**CC        629**

Sexo / Sex   Lugar de nacimiento / Place of birth
**M         MEDELLIN COL**

Fecha de expedicion / Date of issue
**09 JUL/JUL 2014**

Autoridad / Authority
**G. ANTIOQUIA**

Fecha de Vencimiento / Date of expiry
**08 JUL/JUL 2024**

Firma del titular / Holder's signature

P<COLAGUDELO<QUIROS<<SANTIAGO<<<<<<<<<<<<<<
P9COL9005260M2407083CC1        <<90



## COMO NOTARIA TREINTA Y UNO (31) DEL CIRCULO DE MEDELLÍN

### CERTIFICO

Que el presente documento es fiel copia y se encuentra protocolizada en el archivo de esta notaría, debidamente autorizada.

2 8 FEB 2024

**PAULINA GOMEZ GONZALEZ**
NOTARIA TREINTA Y UNO (31) DE MEDELLIN



# EXHIBIT C

### DECLARACIÓN JURADA

1.  I, Hector Diaz Yanez , in my personal capacity and as president of **Soluciones Integrales QBA.**, of legal age, divorced, and resident of ▮▮▮▮▮▮▮ Miami FL 33173., with Driver's License number▮▮▮▮▮▮-451-0, under oath declare the following:

2.  That my name and other personal circumstances are as indicated above.

3.  That I am the president of **Soluciones Integrales QBA** , with address in San Mariano # 11 Calzada y 10 de Octubre, Buena Ventura Mun. 10 de Octubre, Havana, Cuba.

4.  That said company is constituted as an MSME  company in Cuba (micro, small and medium-sized enterprises**)**, which are constituted as economic actors with legal personality, focused on the development of the production of goods and the provision of services at the request of natural persons of Cuban nationality, resident in the country.

5.  **Soluciones Integrales QBA** was the company hired by Black Canvas Hospitality SL who was the creator and executive producer and organizer of the Santa María Music Festival, in Cayo Santa María, Cuba. Under this contract, **Soluciones Integrales** QBA was in charge of the technical production, marketing, and hiring of local and international talent.

6.  That as part of the hiring of the talents, **Soluciones Integrales QBA** contacted Mr. Boris Arencibia, who is known as an international artist manager and whose company is known as Caribe Promotions, so that the artists he represented at that time could perform at the Santa Maria Music Fest. He was presented with the idea and concept of the festival. Mr. Arencibia agreed that his artist Tekashi Sixty Nine and in turn made the approach for other artists such as Yailin and Tito El Bambino to participate in it. At the same time, once the idea was presented to the artists, they agreed to participate in the festival

7.  Mr. Arencibia's participation was only limited to the contribution of artists to the festival and had nothing to do with the organization or hiring of the festival.

8.  At no time did **Soluciones Integrales QBA** pay or provide money to Boris Arencibia for authorizing his artists to participate in the Santa Maria Music Fest held from August 17 to 20, 2023 in Cuba.

9.  That what has been stated above is the truth and only the truth. If any of the above information is found to be false, I acknowledge that it will constitute perjury and as such I will be criminally prosecuted under the federal laws of the United States and the laws of the State of Florida.

FOR THE RECORD, I sign this statement in Miami, Florida, on February 20, 2024.

Notary Public State of Florida
Santiago Alonso Herrera
My Commission HH 067195
Expires 11/29/2024

_____
Hector Diaz Yanes

## DECLARACIÓN JURADA

1. Por este medio, yo, **Hector Díaz Yanez** , en mi carácter personal y como presidente de **Soluciones Integrales QBA.**, mayor de edad, divorciado, y vecino de ▓▓▓▓▓▓▓ , Miami FL 33173., con numero de Licencia de conducir D-▓▓▓▓▓▓▓ ,  bajo juramento declaro lo siguiente:

2. Que mi nombre y demás circunstancias personales son las antes indicadas.

3. Que soy el presidente de **Soluciones Integrales QBA** con dirección en San Mariano # 11 Calzada y 10 de Octubre Buena Ventura Mun. 10 de Octubre La Habana Cuba.

4. Que dicha empresa esta constituida como una empresa MIPYME en Cuba **(**micros, pequeñas y medianas empresas**)**, las cuales se constituyen como actores económicos con personalidad jurídica, enfocadas al desarrollo de la producción de bienes y la prestación de servicios a solicitud de personas naturales de nacionalidad cubana, residentes en el país .

5. **Soluciones Integrales QBA** fue la empresa contratada por Black Canvas Hospitality SL quien fue creadora y productora ejecutiva y organizadora del Santa María Music Festival, en el Cayo Santa María, Cuba. Bajo dicho contrato **Soluciones Integrales QBA** se encargó de la producción técnica, mercadeo, y la contratación de talentos locales e internacionales.

6. Que como parte de la contratación de los talentos, **Soluciones Integrales QBA** contacto al Señor Boris Arencibia, el cual se conoce como manejador de artistas internacionales y cuya compañía se conoce como Caribe Promotions , para que los artistas el cual representaba en aquel entonces pudieran presentarse en el Santa María Music Fest . Se le presento la idea y el concepto del festival. El señor Arencibia estuvo de acuerdo en que su artista Tekashi Sixty Nine y a su vez hizo el acercamiento para otros artistas como Yailin y Tito El Bambino participaran del mismo. A su vez una vez se le presento la idea a los artistas y estos  estuvieron de acuerdo en participar del festival.

7. La participación del Señor Arencibia solo se limitó a la aportación de artistas para el festival y no tuvo nada que ver con la organización o contratación del festival.

8. En Ningún momento **Soluciones Integrales QBA** le pago o proveyó dinero a Boris Arencibia por autorizar que sus artistas participaran en el Santa María Music Fest realizado del 17 al 20 de agosto del 2023 en Cuba.

9. Que lo anteriormente declarado es la verdad y solamente la verdad. De resultar falso cualquier dato de los mencionados anteriormente, reconozco que constituirá perjurio y como tal sería procesado criminalmente conforme a las leyes federales de los Estados Unidos y las del Estado de Florida.

PARA QUE ASÍ CONSTE, firmo la presente declaración en Miami FL, a 20 de febrero  de 2024.



Notary Public State of Florida
Santiago Alonso Herrera
My Commission HH 067195
Expires 11/29/2024

_____
Hector Díaz Yanes